MENASHA WOODENWARE COMPANY, Appellant, vs. RAIL-
ROAD COMMISSION OF WISCONSIN and others, Respond-
ents.

WISCONSIN & NORTHERN RAILROAD COMPANY, Appellant, vs.
RAILROAD COMMISSION OF WISCONSIN and others, Re-
spondents.

*January 11—February 5, 1918.*

*Railroads: Extensions and spurs distinguished: "Public use:" Powers
of railroad commission: Review of order requiring spur track:
Reasonableness: Questions of fact: Statutes construed: "Indus-
try or enterprise" to be served by spur: Logging industry:
"Practically indispensable to successful operation:" "Unreason-
ably harmful to public interest."*

1. An "extension" of the line of a railroad must, when built, be
   operated by the company as a common carrier, serving the pub-
   lic thereby on equal terms. It differs in this respect from a
   "spur track," which, though a part of the railroad system, is in
   its essence a facility for one shipper or for several shippers, who
   contribute to its construction.

2. The service of any particular spur track being denied to no in-
   dustry which it is reasonably feasible for the spur to serve and
   which contributes an equitable share of the cost of construction,
   so that all concerns having occasion to use the track in their
   business transactions with the public are given the right to use
   it on the same equitable terms, the use is a "public use," al-
   though not of precisely the same quality as the public use which
   pertains to an extension of the main line of a railroad.

3. A refusal by the railroad commission to grant a certificate of
   convenience and necessity for the building of an extension
   (under sec. 1797—44, Stats.) does not prevent the commission
   from ordering the construction of a spur track (under sec.
   1797—11m) over the same route or a part thereof.

4. Where the railroad commission has found the existence of the
   essential conditions authorizing it to order the construction of
   a spur track, the court, in an action brought under sec. 1797—16,
   Stats., to vacate such order, does not try those questions of fact
   like a court of first instance, but only determines whether the
   order is "unlawful or unreasonable," and upon this question the
   burden of proof is upon the plaintiff to show the fact by clear
   and satisfactory evidence. If reasonable men might well differ

as to the correctness of the order it cannot be held unreasonable.

5. Where the owner of a lumber mill owned also a stock of standing timber fifty or sixty miles away which it had bought for the express purpose of furnishing material for the operation of the mill, the cutting of such timber, the shipping of the logs to the mill, and the manufacture of them into lumber are all component parts of one "industry or enterprise," within the meaning of sec. 1797—11$m$, Stats. *It seems* that a logging industry pure and simple, not connected with a mill, may be an "industry or enterprise" within the meaning of the statute.

6. A finding by the railroad commission, as a basis for an order requiring the building and operation of a spur track, that such spur was "practically indispensable to the successful operation of" the industry above mentioned, cannot be held unreasonable where there was evidence that a considerable saving in the transportation of logs to the mill would result, even though reasonable minds might differ on the proposition that such saving was practically indispensable.

7. "Practically indispensable," in sec. 1797—11$m$, Stats., does not mean so essential that the industry would go into bankruptcy without it. "Successful operation" presupposes efficient and economical operation relieved from undue burdens, and means also operation yielding a reasonable profit.

8. The fact that, if a spur be constructed by one railroad, another railroad will lose the carriage of millions of feet of logs, is to be carefully considered but is not controlling upon the question whether an order should be made requiring the spur to be built; and where the railroad commission has made such order it cannot be held that the spur would be "unreasonably harmful to public interest" (sec. 1797—11$m$, Stats.), if reasonable men can say that countervailing considerations, such as the continued successful operation of a great industry employing many men, will outweigh any injury suffered by the public as a result of the decrease in the revenues of said other railroad.

ESCHWEILER, J., dissents.

APPEALS from judgments of the circuit court for Dane county: JOHN J. GREGORY, Judge. *Affirmed.*

These are two actions brought under sec. 1797—16, Stats., to vacate an order of the *Railroad Commission of Wisconsin* commanding the respondent the *Chicago & Northwestern Railway Company* to condemn the right of way for, con-

Menasha Woodenware Co. v. Railroad Comm. 167 Wis. 19.

struct, and operate a spur track one and one-half miles in length from the terminus of one of its branch lines to certain timber lands owned by the respondent the *Oconto Company.* The *Menasha Woodenware Company* owns the land through which the spur track is to be laid, and owns nearly one third of the capital stock of the *Wisconsin & Northern Railroad Company,* a commercial railroad corporation operating a railroad a few miles to the west thereof.   The situation will be more easily understood by reference to the accompanying map:

The Kingston branch of the *Chicago & Northwestern Railway* (which connects with the main line road near a station called Kingston, some fifteen miles southeast of the south end of the branch as shown on the map) terminates at the south line of section 31, town 32 north, of range 15 east. The proposed spur extends northeastward about a mile and a half through unoccupied timber lands of the appellant the *Menasha Woodenware Company,* and there reaches a body of lands the timber upon which is owned by the *Oconto Company.* These timber lands extend northwestward from this point in a fairly compact shape through townships 32 and 33, and amount to somewhere near 16,000 acres, with standing timber thereon estimated to be about 160,000,000 feet. The *Oconto Company* has for many years owned and operated a lumber mill at Oconto, Wisconsin, the plant being valued at about $180,000, employing nearly 300 men, and having a capacity of eighteen to twenty million feet per annum when run in the daytime only. The testimony tended to show that this timber was purchased by the *Oconto Company* for the purpose of supplying its mill at Oconto, and that it has no other source of supply. Desiring to obtain railroad facilities for the transportation of this timber to their mill at Oconto, the *Oconto Company* induced the *Chicago & Northwestern Railway Company* in May, 1916, to apply to the *Railroad Commission* for a certificate of convenience and necessity to extend the Kingston branch line about nine miles in a general northwesterly direction through town 32 and ending near the center of section 27, town 33, range 14. Before this application was passed upon the *Wisconsin & Northern Company* applied for a certificate of convenience and necessity to construct a branch line from its station of Hollister northeasterly and then southeasterly, practically along the dotted line indicated on the map, a distance of eight or nine miles, and the *Commission* denied the application of the *Northwestern Company* and granted the

application of the *Wisconsin & Northern Company*. About a mile and a half of said extension has been built, but not sufficient to serve the needs of the *Oconto Company*. This authorized extension is indicated on the map by the dotted line.

The *Wisconsin & Northern Railroad* does not reach Oconto, but runs to Shawano, fifty-two miles south of Hollister. In order to reach Oconto from Hollister freight must be sent to Shawano and then transshipped over the *Chicago & Northwestern* line a distance of forty miles to Oconto, paying two tariff rates, amounting in the aggregate to 3.2 cents per hundred pounds. The distance from the terminus of the Kingston branch to Oconto on the line of the *Northwestern Railway* is about forty-nine miles, and the freight rate on logs 1.6 cents per hundred, making a difference of $2.10 in freight charge on every thousand feet of logs shipped to Oconto. If the spur in question is built it is the intention of the *Oconto Company* to build logging railroads on its own lands running northwestward (very nearly or quite along the surveyed line of the proposed extension which the *Railroad Commission* refused to allow the *Northwestern Railway Company* to build), so as to bring its timber to the Kingston branch for transport to its mills at Oconto.

Both the *Menasha Company* and the *Wisconsin & Northern Railroad Company* appeared before the *Railroad Commission* and opposed the making of the order directing the spur to be built upon several grounds, which are practically the same grounds taken by them in the present actions and may be briefly stated as follows: (1) The proposed spur track is not to serve any "industry or enterprise" within the meaning of sec. 1797—11*m*, Stats.; (2) even if this objection be held untenable, still the spur track is not practically indispensable to the successful operation of any industry or enterprise; (3) the building of the spur track will be un-

reasonably harmful to the public interest; (4) the application for the alleged spur track is not in fact an application for a spur track, but is an application for an extension of the Kingston branch of the *Chicago & Northwestern Railway Company* under the name of a spur track, and could not legally be granted because a certificate of necessity and convenience for such extension was refused in October, 1916, and under the statute no second application for the same extension can be made within two years from such refusal (sec. 1797—49, Stats.).

The *Railroad Commission* by a majority of its members found that the proposed spur "is practically indispensable to the successful operation of petitioner's industry and enterprise, and its construction and operation is not usually unsafe and dangerous and is not unreasonably harmful to public interest."

The circuit court upheld these findings of fact and sustained the order of the *Railroad Commission.* The court also held that the *Wisconsin & Northern Railroad Company* was not a party in interest within the meaning of sec. 1797—16, Stats., and hence not entitled to bring action to vacate the order of the *Commission.* Both complaints were dismissed on the merits, and the plaintiffs appeal.

*M. J. Wallrich* and *Albert S. Larson* of Shawano and *John C. Thompson* of Oshkosh, for the appellants.

For the respondent *Railroad Commission* there was a brief by *W. C. Owen,* attorney general, *Walter Drew,* deputy attorney general, and *E. E. Brossard,* assistant attorney general; for the respondent *Oconto Company* a brief by *Lines, Spooner & Quarles* of Milwaukee; for the respondent *Chicago & Northwestern Railway Company* a brief by *R. N. Van Doren* of Milwaukee; and the cause was argued orally by *Mr. George Lines, Mr. Van Doren,* and *Mr. Brossard.*

WINSLOW, C. J. The most serious contention made by the appellants in these cases is that the so-called spur track

in question is not really a spur track but is in fact an extension of the Kingston branch of the *Northwestern* line.    We are quite unable to see how this contention can be successfully maintained.    An extension of the line of a railroad becomes, when built, a part of the railroad system which the company must operate as a common carrier, serving the public thereby on equal terms; a spur track, on the other hand, though a part of the railroad system, is, in its essence, a facility for one shipper or for several shippers, who contribute to its construction, it being understood that it is open to all industries which may be practically served by it, who will contribute such equitable share of the original cost as the *Commission* may determine.    In its very nature it cannot serve the public in the complete manner that an extension does, because it is not intended for passenger service and it only reaches the property of one industry, or perhaps several; but its use is none the less public on the part of the one industry or the several industries which it serves, because thereby the one industry or the several industries are enabled to be reached by the public and to be served by the common carrier to the fullest extent.    The service of any particular spur is denied to no industry which it is reasonably feasible for the spur to serve, provided the industry pay its equitable share of the cost; in other words, all concerns which can possibly have any occasion to use the track in their business transactions with the public are given the right to use it on the same equitable terms.    This must be held public use in a true sense, although not a public use of precisely the same quality as that which pertains to an extension of the main line of a railroad. *Union L. Co. v. Railroad Comm.* 144 Wis. 523, 129 N. W. 605.    It necessarily follows that a refusal on the part of the *Railroad Commission* to grant a certificate of convenience and necessity for the building of an extension (under sec. 1797—44, Stats.) does not prevent the *Commission* from making an order requiring the building of a spur track (un-

der sec. 1797—11m, Stats.) over the same route or a part thereof. Different considerations apply to the two cases; in fact an extension may not be desirable because a spur is the only appropriate thing under the circumstances. In the present case the *Commission* decided that the building of a spur and not an extension was the proper thing under the circumstances, and the question presented is simply whether a situation was presented which authorized the *Commission* to order the construction of a spur track under the provisions of sec. 1797—11m, Stats. That section requires the building and operation of a spur track when the spur is (1) 'not more than three miles in length and is (2) "practically indispensable to the successful operation of any existing or proposed mill, elevator, storehouse, warehouse, dock, wharf, pier, manufacturing establishment, lumber yard, coal dock, or other industry or enterprise, and (3) its construction and operation is not usually unsafe and dangerous, and (4) is not unreasonably harmful to public interest." No certificate of convenience and necessity is required for the building of a spur track.

The *Commission*, by a majority of its members, found the existence of all of the above mentioned essential conditions, and hence made the order complained of. In these actions brought to vacate that order, under sec. 1797—16, Stats., the court does not try these questions of fact like a court of first instance; it only determines whether the order of the *Commission* is "unlawful or unreasonable," and upon this question the burden of proof is upon the plaintiff to show the fact by clear and satisfactory evidence. As well said by the late Mr. Justice TIMLIN in the case of *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 116 N. W. 905, "Whether or not the order is within the field of reasonableness, or outside of its boundaries, is the question for the court. It is quite a different question from that which was before the *Commission* in this respect. The

order being found by the court to be such that reasonable men might well differ with respect to its correctness cannot be said to be unreasonable." See, also, *Citizens Tel. Co. v. Railroad Comm.* 157 Wis. 498, 146 N. W. 798.

Applying this test, it seems quite certain to us that no case has been made for the vacation of the order in question. It cannot be said that the conclusions of the *Commission* are unlawful or outside of the field of reason.

It stands admitted that the proposed spur does not exceed three miles in length. It is claimed, however, that there is no industry or enterprise, within the meaning of the statute, to be served by the spur, and that even if there were the building of the spur is not "practically indispensable" to its successful operation.

We see no good reason for holding that a logging industry pure and simple, not connected with a mill, is not an "industry or enterprise" within the meaning of the statute. Here, however, we have a lumber mill at Oconto, owned by the *Oconto Company,* with a stock of standing timber fifty or sixty miles away owned by it and purchased for the express purpose of furnishing material for the operation of the mill for the next fifteen or twenty years. Under the testimony it seems clear to us that the cutting of the timber, the shipping of the logs to the mill, and the manufacture of them into lumber are all component parts of one "industry or enterprise." To hold otherwise would be to convict ourselves of ignorance of the laws of modern business.

It will be noticed that the statute does not require that the spur track terminate at any mill, or building, or yard: it may be anywhere; all that is necessary is that it be practically indispensable to the "successful operation" of the industry. So here, the spur is not at the mill, nor does it connect with any yard, but it reaches the land of the *Oconto Company* at a point where that company can make connection with it by means of its logging railroad and thus trans-

port its logs from the camp to the mill at a saving of $2.10 per thousand feet over any other means of carriage. Now, if there was evidence from which reasonable minds could come to the conclusion that this saving was "practically indispensable" to the successful operation of the *Oconto Company's* business, then the finding of the *Commission* cannot be reversed even though all reasonable minds would not agree on the proposition. That there was considerable such evidence there can be no doubt. "Practically indispensable" does not mean so essential that the industry would go into bankruptcy without it. The statute aims to provide the means for the doing of successful business, not merely for keeping the concern out of bankruptcy. A business which just makes enough money to pay expenses and keep up its plant is not a successful business in any correct sense.

The *Commission* well says in its decision in this case that " 'successful operation' presupposes efficient and economical operation relieved from undue burdens." It means also operation yielding a reasonable profit as a reward of efficient and economical operation.

There was considerable discussion in the present case as to how much of a saving (if any) the *Oconto Company* would make by transporting its logs over the *Northwestern* line instead of over the *Wisconsin & Northern,* even conceding that the freight rate would be $2.10 per thousand less. It was said that if the logs are to be got out over the *Northwestern* road, as the fact is, there must necessarily be some greater expense incurred by the *Oconto Company,* not merely in the building of the spur track itself, but in the building of longer lines of logging track. The amount of the additional expense thus made necessary is not capable of very definite ascertainment, but it is certain that it would come nowhere near the saving of freight on 160,000,000 feet of logs. There would still be a net saving of a considerable sum; a sum which might well spell the difference between a successful

and an unsuccessful business or enterprise. The holding of the *Commission* on this question cannot be disturbed.

It is not claimed that construction and operation of the proposed spur would be usually unsafe and dangerous, hence the only remaining question is whether it would be unreasonably harmful to the public interest.

Upon this point the opinion of the *Commission* is as follows:

"It is claimed that if this spur track is built and the *Oconto Company* is not forced to ship its logs over the *Wisconsin & Northern Railroad,* there is a possibility that the authorized branch of the *Wisconsin & Northern Railroad* will not be constructed by that road. Taking this as a presumption, it is testified that some other timber owners may thus be required to sustain the burden of a longer haul to the *Wisconsin & Northern Railroad* than would be necessary were this branch constructed, casting upon them a burden roughly estimated at perhaps $2 per thousand feet and said to be unreasonably burdensome. Be this as it may, the interests of these timber owners and loggers are private, as is that of the *Oconto Company.* In fact, the most definite and specific injury of a somewhat public nature that might possibly result from our action in this proceeding, as shown by the evidence, would be to deprive the city of Oconto of a substantial established industry. Nor do we believe that the public will be benefited if that industry is crippled to the extent of $2 per thousand feet, in order that some other timber man or men will be benefited to an equal amount. And finally and flatly, we must say that there is no evidence in the case tending to convince us that the agricultural possibilities of this region will be discouraged and set back by the building of this spur track for the handling of logs to Oconto and a presumed consequential loss of traffic to the *Wisconsin & Northern Railroad.*

"Nor are we impressed with the argument that mill owners connected with the *Wisconsin & Northern Railroad* have by law acquired the right, when they located on the line of the *Wisconsin & Northern Railroad,* to demand and expect the opportunity of bidding in the open market for the logs

of the *Oconto Company*. Nor can they reasonably expect or demand that unusual burdens will be placed upon the operating conditions of the *Oconto Company,* in order that the timber of that company may be forced into the open selling market along the *Wisconsin & Northern Railroad.* While these claims have been insistently urged upon us by the intervener, both in the testimony and briefs, we do not believe that it was the intent of those that framed the spur-track law that the law should be used for any such purpose."

It is doubtless true that, if this spur be constructed, the *Wisconsin & Northern Company* will lose the carriage of millions of feet of logs which would otherwise necessarily be transported over its line of road. This is a fact to be carefully considered, but is not at all controlling. If the situation is such that reasonable minds can say, as the *Commission* said, there are countervailing considerations on the other side, such as the question of the continued successful operation of a great industry employing many men, which outweigh any injury suffered by the public as a result of the decrease in the revenues of the *Wisconsin & Northern Railroad,* then the order in question was clearly not unlawful or unreasonable.

The conclusions reached on the merits render it unnecessary to decide the question whether the *Wisconsin & Northern Railway Company* is a party in interest entitled to maintain an action under the provisions of sec. 1797—16, Stats.

*By the Court.*—Judgment affirmed in each case. The *Oconto Company* and the *Chicago & Northwestern Railway Company* to recover their costs in each case, taxing but one attorney fee, however, in each case; the *Railroad Commission* to recover no costs.

ESCHWEILER, J. (*dissenting*). Feeling that the construction and effect given to the statutes under consideration under the facts in this case work an injustice and give to the spur-track statute, sec. 1797—11*m,* a more far-reaching effect and

make it of far higher rank in the line of statutes controlling and regulating railroads than its real purpose and language warrant, compels me to register this dissent.

In 1905 the legislature created the *Railroad Commission,* vesting it with power and jurisdiction to control many features of railroad business. In June and July, 1907, by chs. 454 and 499 of the session laws of that year, a further radical change was made in the public policy of this state. By the first of these chapters further provisions were made for the regulating of the construction and operation of railways by the new sections 1797—39 to 1797—60. By the other chapter, creating secs. 1797m—1 to 1797m—108, jurisdiction was given to that *Commission* to regulate and control public utilities such as street railways, telephones, electric light and gas companies.

The effect of this new policy was to determine and declare that thereafter corporations which require the support and patronage of the public and which require at times the use of the strong arm of the state under the power of eminent domain in the taking of private property for such corporate use, should all thereafter be required to subordinate their private ends and purposes to the public good and be under public control and regulation. Thereafter substantially all future rights that might be sought to be acquired by railroads or by public utilities were, under the provisions of those chapters, required to first have from the *Railroad Commission* a certificate that public *convenience required* and *necessity demanded* the granting of such future right. Either such certificate of public convenience and necessity when issued to a railroad corporation under ch. 454, Laws 1907, or to a public utility under ch. 499 of the same year, gave, created, or confirmed something of value, an interest of some kind entitled to be secured or defended by the judicial power of the state, or it was quite an idle and vain ceremony and its possession added nothing to or detracted nothing from the

former position of the one to whom the *Railroad Commission*
granted it.   I take it it would not seriously be contended
that it meant something as to public utilities and nothing as
to railroads, or *vice versa.*

As to public utilities it has already been held that it has
substance; and that it does give or create what may be called
a monopoly, with the odious meaning theretofore attached
to that term removed (*Calumet S. Co. v. Chilton,* 148 Wis.
334, 358, 359, 135 N. W. 131), a privilege (*McKinley Tel.
Co. v. Cumberland Tel. Co.* 152 Wis. 359, 363, 140 N. W.
38; *Wis. T., L., H. & P. Co. v. Menasha,* 157 Wis. 1, 145
N. W. 231; *La Crosse v. La Crosse G. & E. Co.* 145 Wis.
408, 130 N. W. 530).   It may at least be considered as a
protected privilege, subject to control and regulation but also
to recognition and protection by the state until abandoned or
taken away in the manner prescribed by law.   No reasons
suggest themselves why the privilege granted to the *Wiscon-
sin & Northern* as against the similar application denied to
the *Northwestern* in the extension proceedings in 1916 should
not be considered a somewhat similar protected privilege.
By sec. 1797—49, Stats., the refusal of the application of
the *Chicago & Northwestern* became absolute for a period
of two years from the date of such refusal, October 26, 1916.
By sec. 1797—50, Stats., either the *Northwestern* or the
*Oconto Company* might have had a review in the circuit
court of either or both of such extension proceedings.   No
such review was attempted.   The *Wisconsin & Northern*
acted upon the result of such proceedings, incurred expense
and liability thereunder by commencing to build the Hol-
lister branch.   Practically all that was considered of then
value to either the *Northwestern* or the *Wisconsin & North-
ern* or the *Oconto Company* under the testimony in the ex-
tension proceedings is by this decision swept away from the
one held to be entitled to it in 1916 and landed in the lap of
the other then contestant.

While present or future passenger traffic may be a consideration in some cases of applications for extensions and possibly never in spur tracks, yet in the case at bar passenger traffic was not the consideration before the *Railroad Commission* in 1916; it is undisputed that the then Kingston branch of sixteen miles was devoted practically to no other business than permitting the use of the tracks to the *Oconto Company* for shipping its logs as freight traffic thereon; nor did either railroad in the extension proceedings lay any stress upon possible passenger earnings on either proposed extension. The same questions in substance, essence, and practical effect, if mere nomenclature be disregarded, were before the *Railroad Commission* in 1917 that were before them in 1916 and should be held valid and binding for at least the two-year period fixed by sec. 1797—49.

There are the necessary identities of persons, capacities, subject matter, and ends to be attained found in the proceeding under the extension statutes in the fall of 1916 and these proceedings in the spring of 1917, which would therefore make the former proceedings *res adjudicata*. *Rahr v. Wittmann,* 147 Wis. 195, 202, 132 N. W. 1107; *McMillan v. Barber A. P. Co.* 151 Wis. 48, 50, 138 N. W. 94; *Baker v. Becker,* 153 Wis. 369, 383, 141 N. W. 304; *Zohrlaut v. Mengelberg,* 158 Wis. 392, 148 N. W. 314, 149 N. W. 280. Or even if the identities were not all there to meet the broadest application of the rule just cited, yet the substantial issue as to whether, in view even of the increased cost to the *Oconto Company* in shipping over the *Wisconsin & Northern* rather than the *Northwestern,* which of the two railroads should be given the privilege of access to the logging territory in these townships, was determined adversely to the *Northwestern's* application. There is no new showing here, and the prior determination on that squarely defined issue should be held binding. *Rowell v. Smith,* 123 Wis. 510, 516, 102 N. W. 1.

A lengthy citation is given in the majority opinion from the decision of the *Railroad Commission* on the question of what it considered to be and the view it took as to the question of public interest involved in this spur-track proceeding. A comparison with the written decision made in the extension proceedings by the same *Commission,* although there has been some change in the membership, discloses that the same questions were discussed, and particularly as to what effect the denying of the application of the *Chicago & Northwestern* would have upon the *Oconto Company* by way of increased freight rates.   Upon the same situation and possible future effects upon the same parties, the *Commission* in 1916 came to the diametrically opposite conclusion to that arrived at by the *Commission* in 1917.   Both the *Northwestern* and the *Oconto Company* could have had a review of such conclusion of the *Commission* in 1916 if either had so chosen.   They failed to do so, and I can see no good reason why they should not be bound thereby.

The question of public interest was before the *Commission* in both proceedings and was expressly passed upon by that tribunal in each proceeding; it was required to be considered under the statute as to extensions in determining whether the certificate of public convenience should be given or withheld and under the spur-track statute by the words "not unreasonably harmful to public interest," which words were added to sec. 1797—11m by ch. 481, Laws 1909.   The addition of these words makes it clear that some consideration must be given the rights of all who might be affected under the spur-track proceeding just as much as under the extension statute.

I see no warrant in the statutes for holding that the *Oconto Company* has a higher standing or more rights in asking to have rails laid down over a third person's property by the exercise of the state's right of eminent domain when it is designated as a spur track or when the same rails are to be

laid and space taken for what is called an extension. If any-thing, it is more in accord with the present-day view to say that the private interest of any private enterprise is subor-dinate to and lower than the rights represented by the public interest.

Furthermore, the *Oconto Company* cannot claim the right to have this spur track laid over a third person's property by the right of eminent domain if it is for its private purpose and interest. It is only because such a spur track becomes and is declared to be for a public purpose that the right of eminent domain thereunder can be asserted. This was the precise ground on which the case decided by this court of *Chicago & N. W. R. Co. v. Union L. Co.* 152 Wis. 633, 140 N. W. 346, was affirmed in the same case on appeal to the United States supreme court in *Union L. Co. v. C. & N. W. R. Co.* 233 U. S. 211, 34 Sup. Ct. 522. It is the distinct holding of this court in other cases that as a private enter-prise such an applicant as the *Oconto Company* cannot have the right of eminent domain exercised solely in its behalf. *Wallman v. R. Connor Co.* 115 Wis. 617, 620, 92 N. W. 374; *Chicago & N. W. R. Co. v. Morehouse,* 112 Wis. 1, 87 N. W. 849.

That the application for the relief in 1916 was under one section of the railroad law and that in 1917 under another, but both in substance and reality upon the same facts and to attain the same ends, no more affects the substantial rights to be now determined than did the shifting from state law to federal law in the case of *Curtice v. C. & N. W. R. Co.* 162 Wis. 421, 156 N. W. 484, the second appeal of which, again raising the same question, is decided herewith (166 Wis. 594, 166 N. W. 444).

If the substance and results to be attained under the two statutes, as the facts are disclosed in this case, are not identi-cal and similar, although it seems to me they are identical and similar, then it must necessarily follow that they are

dissimilar and necessarily inconsistent. If so, we have a situation where the *Oconto Company* and the *Northwestern* in the spring of 1916 had two separate, independent, and inconsistent remedies by which they might obtain the same result, namely, shipments from towns 32 and 33 over the *Northwestern* in preference to the *Wisconsin & Northern.* The *Oconto Company* and the *Northwestern* elected to choose at that time the remedy under the extension statute, and upon a full hearing the matter was determined against them by that *Commission,* and that order became binding upon them for two years. They elected to take no proceedings to review the same and ought not now be permitted to proceed under this different remedy to obtain the same identical result, in substance and essence, that they were denied the preceding year. *McDonald v. Markesan C. Co.* 142 Wis. 251, 125 N. W. 444; *Rowell v. Smith,* 123 Wis. 510, 102 N. W. 1; *Crook v. First Nat. Bank,* 83 Wis. 31, 52 N. W. 1131; 15 Cyc. 259.

For these reasons I think the proceedings below should be dismissed.

Owen, J., took no part.