IN RE APPLICATION TO ACQUIRE AND CONDEMN LANDS IN RENVILLE COUNTY FOR A TRANSMISSION LINE. NORTHERN STATES POWER COMPANY v. E. OSLUND AND OTHERS.

GILBERT K. NELSON AND OTHERS, RELATORS.[1]

February 29, 1952.

No. 35,759.

[1]Reported in 51 N. W. (2d) 808, 52 N. W. (2d) 717.

136

*Josiah A. Baker,* for relators.

*Lauerman, Johnson & Gustafson* and *Donald E. Nelson,* for Northern States Power Company, respondent.

MATSON, JUSTICE.

Pursuant to a writ of certiorari, we have for review an order of the district court granting to Northern States Power Company (hereinafter referred to as respondent) a perpetual easement and right of way over certain lands in Renville county for the erection of a 230,000-volt electric transmission line.

The order, which is one for the appointment of commissioners to ascertain and report the amount of damages sustained by the owners of the lands taken, was issued pursuant to M. S. A. 117.07, which authorizes such order only:

(1) If the proposed taking of lands is authorized by law; and

(2) If the proposed taking shall appear to be necessary.

The taking of property necessary to the production and distribution of electric light and power to the public is a taking for a

public use which is authorized by law.[2] Decisions which involve a proposed taking of state-owned lands which have already been dedicated to another specific public purpose—such as a state park— and are actually in use for that purpose are to be distinguished and are not in point.[3]

It follows that the only basic issue here is whether the evidence sustains the trial court's finding that the proposed taking is necessary.

■■■ The foundation idea upon which the right of eminent domain rests is public necessity. In re St. P. & N. P. Ry. Co. 37 Minn. 164, 33 N. W. 701. Although lands may not be taken by eminent domain unless such taking appears to be *necessary*, it is well settled in this jurisdiction that there need be no showing of absolute or indispensable necessity, but only that the proposed taking is *reasonably necessary or convenient* for the furtherance of the end in view.[4] By §§ 222.36 and 300.04, this rule of reasonable necessity or convenience[5] is made expressly applicable to a public service corporation,[6] which in the exercise of a right of eminent domain for the furtherance of its corporate public purpose is required by statute (§ 117.07) to establish that its proposed taking of land is necessary.[7]

We turn to the facts to ascertain whether the evidence sustains a finding that the proposed taking is reasonably necessary or convenient for the furtherance of the purpose of supplying the public

---

[2]See, Otter Tail Power Co. v. Brastad, 128 Minn. 415, 151 N. W. 198; M. S. A. 300.03, 300.04; Annotations, 44 A. L. R. 735, 58 A. L. R. 787; 18 Am. Jur., Eminent Domain, § 67.

[3]See, Minnesota Power & Light Co. v. State, 177 Minn. 343, 225 N. W. 164.

[4]See, Romanchuk v. Plotkin, 215 Minn. 156, 9 N. W. (2d) 421; Burnquist v. Cook, 220 Minn. 48, 19 N. W. (2d) 394.

[5]Similar rule applies to the taking of property for a union depot. § 222.42.

[6]See § 300.03 as to definition of public service corporation.

[7]Pursuant to § 117.01, when the taking of private property is authorized by law, it shall be acquired by eminent domain in the manner prescribed by c. 117, subject, however, to certain exceptions which have no application here.

with electric light and power. The taking is for the acquisition of a 125-foot-wide right of way extending from respondent's Black Dog generator plant near Minneapolis to Granite Falls, Minnesota. This right of way is to be used for the erection of a 230,000-volt bulk power transmission line supported by steel towers spaced about a quarter of a mile apart. Respondent furnishes electricity to an area extending east and west from western Wisconsin to Sioux Falls, South Dakota, and north and south from St. Cloud to the Iowa border. The area west of Minneapolis is now served by three feeder lines which relators assert can be increased in voltage capacity to meet all reasonable needs for light and power. The first of these three feeder lines runs from Minneapolis to Granite Falls via St. Cloud and Paynesville and carries a voltage load of 69,000 volts, which is to be increased to 115,000 volts. The second feeder is a 23,000-volt line, of single-pole construction, running from Minneapolis to Granite Falls via Young America and Renville. The evidence indicates that it would not be feasible to convert this second line to 115,000 volts because the right of way is too narrow for the erection of the H type of poles which would then be required. In other words, it would be necessary to obtain a new right of way by condemnation. A third 69,000-volt feeder line, of single-pole construction, runs from Minneapolis to Granite Falls via Franklin. This latter line, which follows railroad rights of way, passes through small communities and could therefore not be widened to accommodate the H type poles. Again, a new right of way would be essential.

The evidence amply sustains a finding that even if it were possible to convert all three feeder lines to 115,000 volts that would not be adequate to supply the needs of the area. In 1949, respondent began a comprehensive study of the entire system to determine its electric production and distribution requirements. This study was made by its own engineers and was subsequently reviewed and verified by engineers from a nonaffiliated company. Service requirements under a variety of conditions were also studied and verified by means of a calculator board, which reproduced in miniature a

replica of respondent's electric system. The result of this comprehensive survey is part of the evidence and stands practically unchallenged by any other expert testimony.[8] It appears that from 1926 to 1946 respondent experienced an annual expansion rate of 7 percent per annum compounded. From 1946 to 1951, the expansion rate has been 12 percent per annum. The future estimated rate of growth is 10 percent per annum.

On the basis of this study, it appears that reasonable service demands of the southwestern division in 1952 will be close to 60,000 kilowatts, whereas the installed generating capacity is only 24,000 kilowatts. As a result, approximately 35,000 kilowatts will have to come from Minneapolis. The load will increase year by year. In the light of respondent's constantly expanding public service needs, the Black Dog station was built. A site near Minneapolis was selected because of the availability there of natural gas, cheap barge-line coal, and a good water supply.

By reason of the limited capacity of the existing feeder lines, coupled with the impracticability of increasing their carrying load, the building of the 230,000-volt power line at a cost of approximately $5,000,000 was undertaken. As already noted, the feeder line running via St. Cloud and Paynesville is to be increased to 115,000 volts. A new line is also to be built from Granite Falls to Mankato. By thus increasing the voltage between Granite Falls and St. Cloud, and by building the new connection with Mankato, the proposed 230,000-volt line will not only transmit power to Granite Falls for distribution in that immediate area, but will also provide a power reserve for the St. Cloud and the Mankato divisions, with the result that benefits will accrue to the entire service area west of Minneapolis. Undoubtedly the total carrying capacity of the 230,000-volt line goes somewhat beyond the needs of the immediate future; but, insofar as a new or additional line is needed at all, sound engineering demands that it be constructed with a

---

[8]We have not overlooked that certain maps and plans of the Bureau of Reclamation were introduced in evidence in refutation. These are referred to in a subsequent portion of the opinion.

sufficient capacity to allow a reasonable safety factor for unforeseen expansion in service.

Relators contend, however, that respondent has a power reserve of 17.4 percent, which indicates that there is no need for expansion. Aside from the fact that this reserve will quickly be absorbed by respondent's normal expansion of service, it should be noted that the reserve relates to respondent's entire system and is of no value to the southwestern division in the absence of adequate lines for its transmission. A power reserve which is unavailable at a point of shortage is useless. It is further contended that respondent's survey of its service needs is misleading, in that it includes contracts for the furnishing of power to groups which are not now being supplied with electricity. There is, however, nothing to show that these contracts have not been made in good faith to meet imminent needs. It would be unreasonable to hold that a furnisher of electric power must wait until there is an actual shortage or a demand for the fulfillment of its contracts before taking steps to meet its contractual obligations. Maps and plans of the Bureau of Reclamation have also been presented to show that by 1954 or 1955 the development of federal power dams in South Dakota will make available an abundant supply of electricity for Renville county and the surrounding area. There is nothing to show, however, that the bureau's power development plans are anything but tentative, and there is no assurance as to when and as to what extent the resulting electric power will be allocated to this area or for whom it will be made available. In the light of the evidence, we must hold that the evidence sustains the trial court's finding that the 230,000-volt power line between Minneapolis and Granite Falls is reasonably necessary or convenient for the furtherance of respondent's corporate purpose of supplying the public with adequate light and power.

The writ of certiorari is discharged.

Writ discharged.

ON APPEAL FROM CLERK'S TAXATION OF COSTS.

On March 28, 1952, the following opinion was filed:

PER CURIAM.

Appeal from clerk's taxation of costs.

Proceedings in the lower court were taken pursuant to the provisions of M. S. A. 117.01 for the condemnation of certain lands. The lower court found that the taking was necessary and such as was authorized by law. By certiorari in this court, relators sought review of the order of the lower court appointing commissioners to assess damages. The writ of certiorari was discharged, and the cost of the preparation of a transcript of the proceedings in district court was taxed against relators.

Relators contest the allowance by the clerk of the item of $135 for the preparation of the transcript on the ground that the respondent, Northern States Power Company, did not have said transcript prepared solely for use in and before this court.

Pursuant to § 607.01 and pursuant to our holding in Larson v. Tweten, 185 Minn. 652, 242 N. W. 378, costs paid or incurred for a transcript may be allowed only when such transcript was prepared exclusively for use before this court, was so used in fact, and was necessary to a proper determination of the matter presented for review.

This court by its writ of certiorari required the district court for Renville county to furnish a transcript. Without question the transcript was not only necessary but was actually used in this court. Relators contend, however, that the transcript was not prepared for use only before this court; therefore, that the cost thereof is not taxable. Respondent denies that it was prepared or used for any other purpose. We have nothing more before us than relators' contention and respondent's denial thereof. Relators have made no showing whatever to establish that the transcript was prepared for any other purpose. The fact that the transcript may have been prepared prior to, and in anticipation of, the taking of an appeal or the issuance of a writ of certiorari, or that the

142

transcript was first filed with the district court, or that the transcript may have been used by counsel to refresh their recollection of testimony below in preparation for a proper presentation to this court does nothing to establish that the transcript was prepared for any purpose other than that of necessary use by this court. In the absence of a definite showing to the contrary, it will be presumed, in taxing costs, that a transcript was prepared exclusively for use before the appellate court when such transcript was actually so used and was necessary to review by that court.

The clerk's taxation of costs is affirmed.

Affirmed.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.

