## CHICAGO GREAT WESTERN RAILWAY COMPANY v. EDWARD JESSE AND OTHERS. MARION WALLACE SIMPSON AND OTHERS, RESPONDENTS.

82 N. W. (2d) 227.

March 29, 1957—No. 37,030.

*William W. Essling,* for relators.
*Grannis & Grannis,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Certiorari to review an order of the District Court of Dakota County.

On April 6, 1956, the Chicago Great Western Railway Company filed a petition in the district court requesting an order of the court allowing them to acquire certain interests in the property of the relators, Mr. and Mrs. Jesse and Mr. and Mrs. Robersen. This petition, among other things, alleged that the main line of their railroad runs generally in a northerly and southerly direction from Minneapolis and St. Paul to Kansas City, Missouri, and Chicago, Illinois; that it runs through Dakota County; that the Iowa Development Company, which is a wholly owned subsidiary of the petitioner, owned 4,000 acres of land in Rosemount and Inver Grove Townships, Dakota County, Minnesota; that this land is located between the petitioner's right-of-way and the Mississippi River, with a part of it to the west of its right-of-way; that two large industries have already located on this property; and that within the next ten years the remainder of the property will be purchased by large industrial enterprises. It next alleged that in order to give adequate service to the two industries already located on the property and to other

industries which might in the future locate in this area it is necessary for it to construct a line of railroad track which would eventually encircle a large part of the 4,000 acres; that a part of this track has already been constructed; and that it will be necessary to acquire a further strip of land in Rosemount and Inver Grove Townships approximately 200 feet in width. It then alleged that it is thus necessary to acquire a certain portion of the property owned by the relators, with the right to enter upon this land to survey, construct, operate, and maintain railroad tracks, and to repair, rebuild, replace, patrol, and to acquire the right to trim and remove all trees or branches of trees on the property they seek to condemn; they further asked for the right to remove gravel, dirt, and earth from this land for the purpose of filling and grading the line of the railroad. It also alleged that they have been unable to purchase the necessary interest.

A hearing on this petition was commenced on June 15, 1956, and on July 12, following the hearing, the district court issued an order in favor of the petitioner. The court found, among other things, that the allegations of the petitioner had been fully proved and that it was necessary and convenient for the use, operation, and enjoyment of petitioner railroad and the use thereof by the public that an easement estate in the lands set forth in the petition as amended be acquired by condemnation. The court then concluded accordingly and appointed appraisers to ascertain and report the amount of damages which would be sustained by the relators.

On July 27, 1956, upon an application of the relators this court issued a writ of certiorari to the District Court of Dakota County for the purpose of reviewing the district court's order in favor of the petitioner.

Three issues are raised in this court by the relators pursuant to their contention that the district court's order should be vacated, set aside, and in all respects discharged. These issues are as follows:

(1) Whether the district court's finding of the public necessity is sustained by the evidence in this case;

(2) Whether the district court lacked jurisdiction in that the petitioner failed to comply with certain requirements, 49 USCA, § 1(18,19,20,21); and

(3) Whether the district court lacked jurisdiction due to the failure of the petitioner to meet certain requirements of M. S. A. 222.28 and 222.32.

■ With respect to the first issue the relators contend that the railroad has failed to sustain its burden of proving that the land they seek to condemn is necessary or convenient. They cite Minnesota Canal & Power Co. v. Koochiching Co. 97 Minn. 429, 107 N. W. 405, 5 L.R.A.(N.S.) 638, to the effect that in this state the court is required to determine whether the proposed public use of the property sought to be condemned will be for the public benefit. Under this rule the relators contend that the condemnation sought in the case at bar is not for a public use.

A review of the evidence in this case shows the following situation: The railroad's main line runs in a general northerly and southerly direction through Dakota County in the townships of Inver Grove and Rosemount, these being the townships where the property in question is located. The railroad intends to run what is known as a large industrial belt line from the main track in an easterly direction; from there to loop through a large area of land in the southerly part of this area; then to loop back in a westerly direction to connect with the main track again. The belt line itself when finished will be about 7½ miles long and will cost approximately $60,000 per mile.

A good portion of the property through which the belt line is to run is owned by the Iowa Development Company, a wholly owned subsidiary of the petitioner railroad. The evidence further shows that about 4¾ miles of the proposed belt line has already been constructed. A part of this construction runs easterly from where it leaves the main line at the northerly end of the area and a part runs easterly from the main line at the southerly end. The proposed new trackage will connect those two "dead end" lines into a continuous 7½-mile belt line. The record also shows that two large industries have

located in this area and are now making use of the portions of the belt line already constructed.

In order to complete the belt line in its proposed location the railroad company seeks to condemn a right-of-way easement over portions of the property owned by the relators. There is testimony in the record that the purpose of this belt line is to serve industry and facilitate the switching of cars and that it would be used in shipping freight that would enter interstate commerce. No contention seems to be made that the proposed trackage has any other purpose than to move materials in and out of this area to the main track. There is also testimony that the proposed route for the belt line is the most practical and feasible from an engineering and construction standpoint and that, when the belt line has been completed, an alternative route to the main track will be provided for the two industries already using the constructed portions as spur tracks.

There was testimony that the area in and around this belt line is building up; that industry will be moving into the area after the belt line is completed; and that these areas will be better served because the belt line will provide an entry into the area from the north as well as from the south. It is further stated in the record that the railroad company is considering applications at the present time from industries which desire to move into the area and that there would be no other economic and feasible routes to operate this large industrial area without a complete loop. There is also evidence that it is advantageous to put a continuous circle of trackage to properly serve all the industries that are located or might locate in this area.

M. S. A. 222.27 gives every foreign and domestic railroad corporation the power to acquire, by purchase or condemnation, among other things, spur and side tracks and grounds for all other structures necessary or convenient for the use, operation, or enjoyment of the road. A common carrier serves both the public and itself. It has its public and its private functions. The public part is the exercise of its franchise for the accommodation of public travel, and whatever is necessary to the exercise of the franchise is for the benefit of the public. 2 Nichols, Eminent Domain (3 ed.) § 7.5211. The

fundamental idea upon which the right of eminent domain rests is public necessity. In re St. Paul & N. P. Ry. Co. 37 Minn. 164, 33 N. W. 701.

It may be conceded, as contended by the relators, that there must be a showing of necessity and that the property will be taken for a public use. In Northern States Power Co. v. Oslund, 236 Minn. 135, 51 N. W. (2d) 808, 52 N. W. (2d) 717, our court stated that lands may not be taken by eminent domain unless such taking appears to be necessary. We further said in that case that it is well settled in this jurisdiction that it is not necessary to show an absolute or indispensable necessity but only that the proposed taking is reasonably necessary or convenient for the furtherance of the end in view.

In Dotson v. Atchison, T. & S. F. Ry. Co. 81 Kan. 816, 106 P. 1045, the contention was made that the traffic on the spur in question could not be regarded as public use and that therefore the rule of the authorities cited in that case did not apply. The court took the position there that whether the use is public is not determined by the length of the spur of the railroad nor the number of industries it may serve; rather it said that, if it is a part of the railroad system which the public may use on equal terms as of right and is subject to government regulations, it is public use whether a few or many are accommodated by its operation.

In its very nature a spur track cannot serve the public in the same manner as an extension of the main line because it is not intended for passenger service but its use is still public on the part of the industry, or several industries, which it serves in that such industries may then be reached by the public through a common carrier to the fullest extent. The service of any particular spur is denied to no industry which it is reasonably feasible for the spur to serve. Thus it must be said that use of a track serving industries is a public use, although not of precisely the same quality as that which pertains to an extension of the main line of a railroad. Reter v. Davenport, R. I. & N. W. Ry. Co. 243 Iowa 1112, 54 N. W. (2d) 863, 35 A. L. R. (2d) 1306; Menasha Woodenware Co. v. Railroad Comm. 167 Wis. 19, 166 N. W. 435; Union Lime Co. v. Railroad Comm. 144

Wis. 523, 129 N. W. 605. For an extensive review of the subject involved, see Annotation, 35 A. L. R. (2d) 1326.

Our court has gone so far as to recognize the public character of a spur track added to the end of a private spur track. N. P. Ry. Co. v. Pioneer Fuel Co. 148 Minn. 214, 181 N. W. 341. In that case it was contended that the property being taken was for a private and not for a public use because it was argued that the public could only use the portion of the new spur involved if it obtained the consent of the company owning an easement for the private right-of-way. Our court refused to follow this contention on the grounds that in the future the railroad company could change the situation if it so desired by connecting the new portion of the spur track with another spur track leading directly to its main line.

It may also be stated that necessity in this connection may mean in the near future. See, State ex rel. City of Duluth v. Duluth St. Ry. Co. 179 Minn. 548, 229 N. W. 883. As a practical matter, in these days of rapidly changing conditions and industrial expansion, we as a court must recognize the fact that manufacturing plants must be located in proximity to transportation facilities because of the necessity of marketing their products or getting raw material to their plants for manufacturing purposes. For us to say as a matter of law in all cases that industries must precede the transportation facilities would be impractical as it is common knowledge, especially in the early days of the development of our country, that railroads were built through vast uninhabited areas; that the people and industry settled the region later as a result of the transportation facilities being available. See, State ex rel. Ami Co. v. Superior Court, 42 Wash. 675, 85 P. 669.

While the evidence in this case is conflicting as to the absolute necessity of the taking here involved, it is our opinion under the above-cited cases that the evidence as a whole sustains the findings of the trial court. As already pointed out, there is evidence to show that completing the belt line is the best way to serve industries now located and to be located in this area and that this is an area which will likely be developed in the near future. Thus it may be said that

the proposed taking is reasonably necessary or convenient for furtherance of the end in view. There is no evidence in the record tending to show that the proposed belt line will be used for any purpose other than that for which a spur or industrial track is generally used. On the contrary, all the evidence tends to show that the proposed track will be put to such a use. Therefore the trial court's findings and conclusions with respect to the necessity and public character must be affirmed.

■ With reference to the second issue, it is contended by relators that the railroad company must comply with 49 USCA, § 1 (18, 19, 20, 21), this being a portion of the Interstate Commerce Act. These sections provide that a railroad, before it extends its line, must obtain a certificate of convenience and necessity from the Interstate Commerce Commission. However, § 1(22) of the act specifically excludes industrial and spur tracks. In this connection relators contend that the proposed trackage in this case is not a spur or industrial track within the exception of the Interstate Commerce Act and that therefore the district court in this case has no jurisdiction to act prior to a determination of the Interstate Commerce Commission. It is not necessary for us to pass on this question of jurisdiction as in our opinion the trackage involved here does not constitute an extension of petitioner's railroad and therefore a determination by the Interstate Commerce Commission would not be necessary in any such case.

One of the leading cases cited by the relators is Texas & Pac. Ry. Co. v. Gulf, C. & S. F. Ry. Co. 270 U. S. 266, 46 S. Ct. 263, 70 L. ed. 578. That case involved a situation where one railroad sought to lay a track into an industrial area which was already being served by another railroad. The court held that the proposed track was an extension rather than a spur or industrial track. It placed primary emphasis on the Interstate Commerce Act in determining the meaning of extension and industrial track and pointed out that the act recognized that the preservation of the earning capacity and conservation of financial resources of individual carriers is a matter of national concern; that the property employed must be permitted to

earn a reasonable return; that the building of unnecessary lines involves a waste of resources and that the burden of that waste may fall upon the public; that the competition between carriers may result in harm to the public as well as in benefits; and that when a railroad inflicts injury upon its rival it may be the public which ultimately bears the loss. The court recognized that the purposes of the track and local conditions should govern as to whether the construction should be allowed, but went on to lay down the following exception (270 U. S. 278, 46 S. Ct. 266, 70 L. ed. 584) :

"* * * But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of paragraph 18, although the line be short and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks."

Thus, while the length of the track, its cost, and its purpose are very important, the controlling factor as to requiring a certificate of necessity by the Interstate Commerce Commission is whether the proposed trackage is to enter new territory, which in turn depends largely upon whether one railroad is encroaching upon territory already served by another railroad. In this connection, see Union Pac. R. Co. v. Denver & R. G. W. R. Co. (10 Cir.) 198 F. (2d) 854; Chicago, R. I. & P. R. Co. v. Thompson (E. D. Ark.) 135 F. Supp. 43; Detroit & Toledo S. L. R. Co. v. New York Cent. R. Co. (6 Cir.) 233 F. (2d) 168.

On the record before us there is no evidence of petitioner railroad entering a new territory which is already served by another railroad. While it is true that the industrial trackage involved here is quite

long and costly, its length is necessitated to a great extent by the fact that it loops from the main track, travels through an area adjacent to the track, and then circles back to the main track, and not by the fact that it is going off 7½ miles into new territory. It could not be argued that petitioner was entering new territory if, instead of the proposed belt line, it elected to construct spur tracks from the main line directly to each industry which is or may be located in the area. We do not think that the track loses its character as a spur or industrial track simply because the same purpose is served by a continuous route through the proposed industrial area. Since it cannot be said that the railroad here is entering new territory, it is therefore our opinion that the requirements of 49 USCA, § 1 (18, 19, 20, 21), are not applicable in the instant case.

■ The third issue arises from the contention of relators that the district court lacked jurisdiction in this case on the grounds that the petitioner railroad failed to comply with M. S. A. 222.28 and 222.32. So far as this case is concerned, § 222.28 provides that a railroad, before making an extension or building a branch road, must designate the route thereof by resolution of its board of directors; and a certified copy of such resolution, together with a map or plat, signed and verified by its president and secretary must be filed for record with the secretary of state. Section 222.32 deals with essentially the same thing but in more detail. The requirements of these sections by their terms apply only to extension or branch lines of the railroad, and as we have already pointed out we are dealing here with spur or industrial track and therefore these statutes are not applicable. In our opinion, if the legislature had intended these sections to apply to a situation such as we are dealing with here, it would have included more than branches and extensions and would have specifically mentioned spur and side tracks as was done in § 222.27, where foreign and domestic railroad corporations are given the power—

"* * * to acquire, by purchase or condemnation, all necessary roadways, spur and side tracks, rights of way, depot grounds, yards, grounds for gravel pits, machine shops, warehouses, elevators, depots,

station houses, and all other structures necessary or convenient for the use, operation, or enjoyment of the road, * * *."

We have considered carefully all the cases from foreign jurisdictions cited by the relators, and so far as they may conflict with our holdings in this case we do not choose to follow such cases.

Affirmed.