The CITY OF MINNEAPOLIS,
petitioner, respondent,

v.

Angus WURTELE, et al.,
respondents-below,

Bessie M. Seeley, et al., respondents-below, Appellants,

R. E. Short Co., respondent-below,
Appellant,

Robert R. BIGLOW and Hartley Nordin,
respondents-below, Appellants,

v.

OXFORD DEVELOPMENT
CORPORATION,
intervenor,

Oxford Properties, U. S., Ltd. and MCC Development Company, Inc.,
intervenors, Respondents.

Nos. 50256, 50257, 50283 to 50285.

Supreme Court of Minnesota.

March 28, 1980.

Moriarty, Whaley, Jansen & Woods and Louis J. Moriarty, Minneapolis, for Seeley, et al.

Foster, Jensen & Short and Brian P. Short, Minneapolis, for R. E. Short Co.

Robert R. Biglow and Hartley Nordin, Minneapolis, for Biglow and Nordin.

Robert J. Alfton, City Atty., and Jerome F. Fitzgerald and Joseph M. LaBat, Asst. City Attys., Minneapolis, for City of Minneapolis.

Mackall, Crounse & Moore and Connor F. Schmid, Faegre & Benson and James A. Dueholm, Minneapolis, for Oxford Properties, U. S., Ltd., et al.

Fredrikson, Byron, Colborn, Bisbee & Hansen and Marsha A. Freeman, Minneapolis, for Credit Pub. Co., amicus curiae.

PETERSON, Justice.

The Development District Law, Minn. Stat. ch. 472A (1978), was designed to allow municipalities to designate as "development districts" areas which, while not yet "blighted," show a trend toward decreasing economic utility and tax base. Designation of a development district allows a city to implement a program of improvements and to acquire through purchase or eminent domain whatever property it needs for implementation of its program.

The Minneapolis City Council, acting pursuant to this chapter, designated a portion of downtown Minneapolis as Development District 53–A, to be used for construction of the "City Center." The city subsequently petitioned for the condemnation of various

parcels within the newly designated district, and appellants, owners of several of the parcels sought to be condemned, objected to the petition and challenged the validity of the development district on a number of grounds. Oxford Properties, U. S., Ltd. (Oxford), the developer chosen by the city for the project, intervened as an interested third party in support of the condemnation petitions. After extensive evidentiary hearings held off and on from January 29 to March 28, 1979, the court below rejected all of the challenges and granted the petitions for condemnation. In a separate hearing, it granted the city's request for "quick take" under Minn.Stat. § 117.042 (1976) and ordered that title to the land pass immediately to the city and that the owners and occupants vacate within 60 days. We affirm the orders of the trial court.

In late 1974 and early 1975, the Minneapolis City Council, encouraged by various business and community leaders, began to consider designating as a development district the area between Sixth and Seventh Streets between the west wall of the Northwestern National Bank and Second Avenue North, and the block between Hennepin Avenue and First Avenue North and Fifth and Sixth Streets. The council, together with the office of the city coordinator, studied the possibility of a retail-hotel-office space project to be developed in stages and financed through tax increment financing, a typical method of funding such urban redevelopment projects. This project came to be known as "City Center '75" (city center).

After meetings with an advisory board appointed by the council president, and with the county board of commissioners, Minneapolis school board, and city planning commission, and after a public hearing, the council passed a resolution on June 27, 1975, designating Development District 53. Oxford was subsequently chosen to be the developer for the project.

One week after Oxford's selection, the council voted to dissolve District 53, but this action was vetoed by the mayor. During the remainder of 1975 and 1976, plans for city center progressed little, but on June 1, 1977, Oxford presented to the council its development proposal, an option to enter into a development contract. If Oxford exercised its option, the city would sell general obligation bonds, use the proceeds to acquire the property needed for the development, and do whatever demolition and relocation was necessary. The city would then sell the property to Oxford for cash in an amount which would fully indemnify the city for all acquisition, demolition, and relocation expenditures; however, the city would grant Oxford a "construction credit" on the cost of the land based upon the expected tax increment yield, which credit would largely balance out the acquisition cost. Oxford assured the council, however, that the city would be "held harmless" for all costs associated with acquisition.

The boundaries of the Oxford-proposed project, however, did not include the entire District 53 area. Oxford proposed a two-phase development in the area bounded by Sixth and Seventh Streets, the Northwestern National Bank, and Hennepin Avenue. The first phase would be in the area known as Block A–C (bounded by Sixth and Seventh Streets and Nicollet and Hennepin Avenues). The second phase would be in Block B, after Donaldson's department store, the current occupant of most of that block, was moved to its new location in the Phase 1 development.

In subsequent weeks, the development plan and a tax increment financing plan were considered by the community development and ways and means committees of the council, the advisory board, the city planning commission, the county board of commissioners, and the school board. On August 2, 1977, after notice published in *Finance and Commerce*, a public hearing was held on city center and the financing plan. On August 5, the council passed a resolution amending the 1975 District 53 resolution to create two districts—Districts 53–A and 53–B. The area included in District 53–A was the area to be used for city center as proposed by Oxford; District

53–B consisted of the remainder of the original District 53.

At the same meeting, the council approved the development plan and tax increment financing plan for District 53–A, as well as the development contract with Oxford, and authorized the city to petition for condemnation of the parcels in District 53–A, some of which were owned by appellants.

■ 1. In objecting to the condemnation, appellants contend, first, that the city center project was developed to serve predominantly private interests and therefore lacks the public purpose required before land constitutionally may be taken. It is well established that property may not be taken by the government, even for compensation, unless the taking is for a public purpose. Appellants admit, however, that the standard for overturning a city's decision on public purpose grounds is very strict. In *R. E. Short Co. v. City of Minneapolis*, 269 N.W.2d 331 (Minn.1978), we held that a public body's decision that a project is in the public interest is presumed correct unless there is a showing of fraud or undue influence. Our decision in *Lifteau v. Metropolitan Sports Facility Comm'n*, 270 N.W.2d 749 (Minn.1978), shows the great deference accorded to a legislative decision that a public purpose is served.

■ In this case, the council made detailed findings that the designation of a development district and the construction of the city center would greatly benefit Minneapolis. It found the area was potentially useful and valuable, but was currently stagnant and unproductive because of lack of proper utilization and lack of investment. It also found the properties were not contributing to the tax base to their full potential, and existing buildings and facilities were obsolete. The council concluded revitalization of the area was essential to maintaining downtown Minneapolis as a viable business district, and this revitalization could not be achieved by private developers without public action.

The trial court found on ample evidence that the city center project would create 5,900 permanent jobs and 400 to 500 temporary jobs; attract 12,600 new residents; attract conventioneers who would infuse $5 million annually into the local economy; generate $22 million in new retail sales; and produce $2.1 to $5.3 million annually in additional real estate taxes. None of these benefits was seriously disputed by the appellants.

■ Appellants contend, however, that the council's decision to approve the project was motivated not by these public benefits, but by private interests. We have said a municipality's finding of public purpose can be negated by a showing of bad faith or tainted motive. *Housing & Redevelopment Authority v. Schapiro*, 297 Minn. 103, 210 N.W.2d 211 (1973). Appellants introduced evidence at trial which they claim showed the primary purpose for the city center was to serve the private economic interests of Oxford and Northwestern National Bank, with the cooperation of the council.

The evidence upon which appellants rely was at best ambiguous and speculative and did not militate against the trial court's conclusion that the city center project served a legitimate public purpose. Business redevelopment projects by their nature require the involvement and initiative of business interests in the community. The fact that a project may benefit private business, while warranting examination, does not without more deprive the project of its public purpose.

Appellants also contend the city's contract with Oxford should be voided on the grounds that Oxford misled the city into believing that 100 percent of the tax increment yield would be available to the city to retire the bonds sold for funds to acquire the land for the project when, in fact, only 60 percent of the yield would be available because of the Fiscal Disparities Law, Minn. Stat. ch. 473F (1976). We do not address the issue whether a third party can void a city contract on grounds of fraud or misrepresentation when the city itself wishes to honor the contract. In this case, there is no

evidence that the city was misled about the effect of the Fiscal Disparities Law, or about the available tax increment yield.

We hold, therefore, that the trial court finding of public purpose was justified on all the evidence.

2. Appellants next contend that neither District 53 nor District 53–A was validly designated under the procedures prescribed by ch. 472A. Neither party disputes that if a development district has not been validly created, the city is without the authority to condemn appellants' property. The city responds, however, that its designation of District 53 and later of District 53–A adequately complied with all of the procedural requirements.

Because the city center project is limited to District 53–A, we confine our consideration of the procedural challenges to that district designation and do not pass on the adequacy of the designation of District 53 or of District 53–B. We hold, affirming the trial court, that District 53–A was a validly designated development district.

■ We note at the outset that the law does not mandate in all cases strict and literal compliance with all procedural requirements. Technical defects in compliance which do not reflect bad faith, undermine the purpose of the procedures, or prejudice the rights of those intended to be protected by the procedures will not suffice to overturn governmental action, particularly where, as here, substantial commitments have been made. This doctrine of "substantial compliance," applied to cases involving public improvements and special assessments, has been cited in major treatises on municipal law. See 11 McQuillin, *Municipal Corporations*, § 32.119 (1977); 13 McQuillin, *Municipal Corporations*, § 37.42 (1971); Antieau, *Municipal Corporation Law*, §§ 14.21, 23.11 (1979).

We pointed out in *Burnquist v. Cook*, 220 Minn. 48, 19 N.W.2d 394 (1945), that the rule of strict compliance generally applied in eminent domain cases will be relaxed when the condemning authority is public rather than private. We have also stated that the aim of statutory construction is to save rather than to destroy. *State, by Burnquist, v. Flach*, 213 Minn. 353, 6 N.W.2d 805 (1942).

It is true that the council was not as precise as it might have been in following the prescribed procedures. On the other hand, appellants were dilatory in protesting the alleged inadequacies.[1] This development project had been under consideration, attended by a great deal of publicity, for over 2 years, yet it was not until the city had made substantial commitments of time and money to the project and then proceeded to acquire the land to implement it that appellants complained of procedural deficiencies. In another case where protest has been more prompt, we will be less reluctant to demand more stringent compliance with procedural requirements, and we caution that all governmental bodies are expected to observe prescribed procedures which are intended to ensure careful and balanced consideration of important public decisions.

■ Appellants allege a number of procedural deficiencies, the most serious of which is a claimed failure to give adequate notice to the public of the August 2, 1977, public hearing held to consider the creation of District 53–A and the city center project. The notice read as follows:

NOTICE IS HEREBY GIVEN that the Minneapolis City Council, sitting as a Committee of the Whole, will conduct a public hearing on Tuesday, August 2, 1977, at 2: p. m., in Room 317 City Hall, Minneapolis, Minnesota, for the purpose of considering the following items for the City Center '75 project: (1) Presentation of the Coopers & Lybrand study; (2) Cre-

---

1. It appears that appellants were aware of the development project from its earliest stages, yet nothing before us indicates that they complained to the council of the alleged procedural deficiencies in time to allow the council to take corrective steps. We also note that one of the property owners, who joined appellants in resisting the condemnation petition below but has since settled with the city, was himself a member of the advisory board which consulted with the council on District 53–A.

ation of Development Districts 653 A & B; (3) City Center '75 Development Plan; (4) City Center '75 Finance Plan; and (5) Action on a proposed contract between the City of Minneapolis and Oxford Development Group, Ltd.

Any person or organization desiring to be heard will be afforded an opportunity to be heard at such hearing, all persons reading this notice being directed to the Plan (Pet. No. 210845) on file in the office of the City Clerk, Rm. 311 City Hall, Minneapolis, Minn.

Appellants contend, first, that errors in this notice rendered it insufficient to meet the requirement of notice in § 472A.03.[2] Specifically, they contend that the typographical error referring to "Districts 653 A & B" rather than "53 A & B," the lack of reference to the authorizing statute, the reference to "finance plan" rather than "tax increment finance plan" and the lack of a more complete description of the city center project and its ramifications made the notice misleading and inaccurate.

■ We hold, in agreement with courts in other jurisdictions, that where a statute requiring notice does not set further guidelines for the form that notice must take, the statute has been satisfied where the notice is "sufficient to apprise one of ordinary intelligence" of the nature and subject of the hearing. 13 McQuillin, *Municipal Corporations*, § 37.42 (1971). Although the notice given in this case could have been much more detailed, it did alert the reader to go into official records for more information. *See Spalti v. Town of Oakland*, 179 Iowa 59, 161 N.W. 17 (1917). We note, as did the trial court, the extensive publicity attending the city center proposal, and we believe

the trial court was justified in finding that despite the typographical errors,[3] the ordinary person would have understood from the notice the nature and subject of the upcoming hearing.

Appellants argue, second, that even if the notice met statutory standards, due process required that the notice be more detailed and that it be published in a form and medium more widely distributed than *Finance and Commerce*.[4] The city responds that since a public hearing on the designation of a development district was not a constitutional but only a statutory requirement, the statute alone delineates the extent of the right to notice and hearing, and the statute only required publication in the official newspaper, *i. e., Finance and Commerce*.

Appellants do not argue that the hearing itself was required by due process, but claim, citing *Alan v. County of Wayne*, 388 Mich. 210, 200 N.W.2d 628 (1972), that once the state gave a statutory right to a hearing, a right to notice meeting due process standards arose. In *Alan*, the Michigan court, applying the United States Supreme Court's opinion in *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), held that notice of a proposed bond issue should have specifically mentioned the public's statutory right to a referendum on the issue and should have been published in a way which would inform the greatest number of electors of that right.

■ We believe appellants' reliance on *Alan* is misplaced. In this case, unlike *Alan*, appellants did not allege nor does it affirmatively appear that they were unaware of the hearing and of the nature of

---

**2.** Section 472A.03 provides that a "municipality may after * * * public hearings, notice of which shall have been published in the official newspaper of the municipality, * * * designate development districts * * *."

**3.** Many courts have held typographical errors would not invalidate a notice. *Gleason v. Waukasha City*, 103 Wis. 225, 79 N.W. 249 (1899); *Chicago & N. W. Ry. Co. v. City of Redfield*, 83 S.D. 450, 160 N.W.2d 640 (1968); *Spalti, supra;*

*City of North Yakima v. Scudder*, 41 Wash. 15, 82 P. 1022 (1905).

**4.** Section 427A.03 requires only that the notice be published in the official newspaper of the municipality, which *Finance and Commerce* was in both 1975 and 1977. Therefore, appellants do not contend that the use of *Finance and Commerce* was inadequate under the statute but, rather, that because of its limited distribution, it was constitutionally inadequate.

the proposed development. Moreover, there is nothing in the record to show there were individuals who would have participated in the hearing but for a lack of notice. Appellants were not themselves prejudiced by any deficiency in the notice, and any assertion that there were potential participants who did not appear at the hearing because of lack of notice is purely speculative. Assuming *arguendo* that the published notice was deficient, there is no standing to raise a constitutional challenge absent a direct and personal harm resulting from the alleged denial of constitutional rights.

We also note that in *Alan* the right which gave rise to the notice requirement was a right of referendum to vote down the bond issue. In the instant case, the public hearing would not have had any binding effect on the city council. Furthermore, there was evidence in *Alan* that the notice was intentionally vague and misleading; there is no indication in this case that the city council deliberately tried to restrict public knowledge of the hearing.

We hold, therefore, that in these circumstances the notice of hearing was statutorily and constitutionally sufficient.

█ Appellants also contend that § 472A.03, by its language, required that more than one public hearing be held. As fully explained in the trial court's comprehensive memorandum, the most reasonable interpretation of the statutory language is that it requires only one hearing. We hold that the city complied with the notice and hearing requirements of the statute.

█ Appellants next contend that the city failed to provide relocation services as required by §§ 472A.03 and 472A.12. They claim the council was required to make specific plans for relocation of persons to be displaced by the development program as a prerequisite to creation of the development district.[5] We agree with the trial court that in this case the city met the statutory requirements by providing a budget for relocation before designating the district and then providing specific relocation services prior to actual displacement. Until an actual development program and contract could be approved, it would be unrealistic for the city to provide specific relocation services, and §§ 472A.03 and 472A.12 do not require such an interpretation. There is nothing in the record to indicate that occupants needing relocation have not been aided in compliance with statutory guidelines.

Appellants also allege that the council failed to consult with a properly chosen advisory board pursuant to §§ 472A.03 and 472A.11. First, they contend the advisory board should have been elected by the public rather than appointed by the council president. Section 472A.11 provides:

Subdivision 1. The governing body of the municipality may create an advisory board except in cities of the first class where the governing body shall create an advisory board. Except as provided in subdivision 2, a majority of the members shall be owners or occupants of real property located in or adjacent to the development district which they serve. The advisory board shall advise the governing body and the administrator on the planning, construction and implementation of the development program, and maintenance and operation of the district after the program has been completed.

Subd. 2. In a substantially residential development district the board shall be comprised of owners and occupants of real property within or adjacent to the district's boundaries. The board may be appointed or elected (except in the cities of Minneapolis and St. Paul where the board shall be elected) according to guidelines established by the governing body.

5. Section 472A.03 provides that the municipality "shall also provide for relocation pursuant to section 472A.12 * * * before making this designation [of a development district]." Section 472A.12 states that "provision must be made for relocation of all persons who would be displaced by a proposed development dis-trict *prior to displacement* in accordance with the provisions of sections 117.50 to 117.56." (Emphasis added.) Section 117.52 incorporates by reference the guidelines of the Uniform Relocation Assistance Act, 42 U.S.C. § 4601 *et seq.*

Appellants contend the second sentence of subd. 2 requires all advisory boards in Minneapolis and St. Paul to be elected. The city responds, and the trial court agreed, that the requirement of an elected board applies only to proposed districts which are "substantially residential," which District 53–A is not.

We conclude that the inclusion of the election requirements in subd. 2, rather than in a separate paragraph or in subd. 1, indicates that the legislature intended to make election of the board mandatory only where a "substantially residential" development district was involved. There is no dispositive legislative history, but the floor and committee discussions of the development district bill show that the concern of those who added subd. 2 to the section was to assure citizen participation in decisions which would affect their residential neighborhoods. Furthermore, the proponents of that subdivision referred to the existing neighborhood councils as providing the framework for election of advisory boards, another indication that election was mandated only for "substantially residential" districts.

We therefore hold that the council was not required by § 472A.11, subd. 2, to hold an election for the advisory board for District 53–A and that appointment by the council president, followed by confirmation by the whole council, was in compliance with § 472A.11, subd. 1.

Appellants also contend that the advisory board which consulted on District 53–A, the same board which had been appointed for the original District 53, was incompetent to carry out its responsibilities because a quorum of the 15-member board was never present at the meetings during which plans for District 53–A were considered and approved. We agree with the trial court that the absence of a quorum of the advisory board will not suffice to overturn the council's action designating District 53–A. While it is probably true that, technically, there should have been a quorum present when the advisory board approved the plans for District 53–A, the board was intended to serve only in an advisory capacity and did not take final or binding action. Furthermore, there is no evidence that the city council procured the low attendance at board meetings. Although the official size of the board was 15 members, death and resignations had reduced the number of existing members to 10, of whom 6 did regularly attend board meetings, and the board did take an active role in the consideration of the district. We hold, therefore, that the council substantially complied with the requirement that it consult with the advisory board.

The final procedural deficiency cited by appellants is the alleged failure of the council to inform fully the Minneapolis Board of Education and the Hennepin County Board of Commissioners of the fiscal implications of Development District 53–A, as required by § 472A.07, subd. 3. Specifically, appellants contend the council should have presented to the school board and the commissioners a finished tax increment financing plan meeting the requirements for such a plan set forth in § 472A.07.

The trial court agreed with appellants that the council was required to "fully inform members of the county boards of commissioners and of the school boards of the fiscal and economic implications of the proposed development district," as a prerequisite to designating the district. The court also held that because the tax increment financing plan was in this case an integral part of the District 53–A proposal, the council had a responsibility to inform the boards about the tax plan in order to comply with this requirement. The tax plan was presented to the boards by members of the staff of the city coordinator's office. At no time have commissioners or school board members complained that they were not adequately informed about the economic ramifications of District 53–A. The trial court concluded after an extensive discussion of the issues that the requirements of § 472A.07 were met and rejected appellants' argument that the boards could not be fully informed unless a final tax increment fi-

nancing plan meeting the specifications of § 472A.07 had been passed by the council prior to its presentation to the boards.

We agree with the trial court's interpretation of the requirements of § 472A.07. Nothing in the language of that section makes passage of a polished, final tax plan a prerequisite to passage of a development district. While the city council must have some concrete financing proposal in order to meet its responsibility to inform the boards, the question of whether in a particular case sufficient information was communicated to the boards to educate them about the economic implications of the district is one of fact. We hold that the trial court was not clearly erroneous in concluding from all the evidence that the boards had been "fully informed."

■ 3. Appellants next contend the city was required to attempt to negotiate for appellants' property before initiating condemnation proceedings. In the case of *School District No. 40 v. Bolstad*, 121 Minn. 376, 141 N.W. 801 (1913), we held that unless otherwise provided by statute, a municipality is not required to negotiate for property as a prerequisite to condemnation. *See also* 11 McQuillin, *Municipal Corporations*, § 32.120a (1977). There is nothing in ch. 472A which establishes such a prerequisite for condemnation for development districts. Chapter 472A expressly provides that a municipality may acquire the land for the district by purchase or by eminent domain, and there is no requirement that purchase be first attempted.

Appellants apparently contend our decision in *Reilly Tar & Chemical Corp. v. City of St. Louis Park*, 265 Minn. 295, 121 N.W.2d 393 (1963), holds that a finding of necessity is a prerequisite to condemnation, and they argue necessity requires a showing that the land could not be acquired except by condemnation. Appellants' reliance on *Reilly Tar* is misplaced. Aside from the fact that the case had nothing to do with whether negotiation is a prerequisite to condemnation, the opinion states only that if the legislature provides in the statute authorizing condemnation that there must

be a finding of necessity by the municipality, the municipality may not act without such a finding. We have concluded that in the Development District Law, the legislature did not set forth such a requirement. Therefore, the city is not precluded from instituting eminent domain proceedings without first negotiating for the land.

4. Finally, appellants Biglow and Nordin, who own property in Block B, the site of development for the second phase of the city center, allege the invocation of the "quick take" statute, § 117.042, was improper. Section 117.042 provides:

Whenever the petitioner shall *require* title and possession of all or part of the owner's property prior to the filing of an award by the court appointed commissioners, the petitioner shall, at least 90 days prior to the date on which possession is to be taken, notify the owner of the intent to possess by notice served by [certified] mail and before taking title and possession shall pay to the owner or deposit with the court an amount equal to petitioner's approved appraisal of value. If it is deemed necessary to deposit the above amount with the court the petitioner may apply to the court for an order transferring title and possession of the property or properties involved from the owner to the petitioner. [Emphasis added.]

Biglow and Nordin contend the Block B property would not be "required" by the city until 1982, after the first phase of construction on Block A–C is complete, and that therefore the city had no right to immediate title and possession before the court-appointed commissioners had an opportunity to file their award. The trial court concluded it did not have authority to review the city's decision as to the timing of its exercise of eminent domain and held the city could "quick take" the property at its discretion.

■ *Cooperative Power Association v. Eaton*, 284 N.W.2d 395 (Minn.1979), held that the parties to a condemnation should be permitted to present evidence at a judi-

cial hearing on whether the condemning authority actually "required" the property prior to the filing of the commissioners' award. Although in general the timing of the exercise of eminent domain is a legislative decision and is not open to judicial review once public purpose has been established, *Fairchild v. City of St. Paul*, 46 Minn. 540, 542, 49 N.W. 325, 325 (1891), our decision in *Reilly Tar, supra*, established that where the legislature itself chooses to limit the municipality's exercise of eminent domain by requiring some finding of necessity, a court may review that finding to determine it was justified on the facts.

██ As the opinion in *Cooperative Power Association* indicates, we interpret § 117.042 to limit the use of "quick take" to cases where a municipality could reasonably determine that it needs the property before the commissioners' award could be filed.

██ The city contends in this case that it was necessary to resolve at the beginning any and all disputes over the property to be used for the city center and that even though some property would not be developed until much later, the city needed to assure itself and Oxford of clear title before further investments were made. Although the trial court should have made a formal finding on the issue of necessity for a quick take, we think in the full context of this case that the city has shown it did "require" a quick take of appellants' property within the meaning of § 117.042. A remand to the trial court for a formal finding on this issue would serve no useful purpose in the circumstances of this case.

We therefore affirm the decision of the trial court upholding the designation of District 53–A and granting the petitions for condemnation and immediate transfer of title and possession of appellants' property.

Affirmed.