Danny O. LUNDELL and Mary E. Lundell, Appellants,

v.

COOPERATIVE POWER ASSOCIATION, a Minnesota Corporation, Respondent.

No. A04–1045.

Supreme Court of Minnesota.

Jan. 5, 2006.

Lance R. Heisler, Lampe, Swanson, Morisette & Heisler L.L.P., Northfield, MN, for Appellant Lundell.

Paul Barney Zisla, Moss & Barnett, Peter A. Koller, Moss & Barnett, P.A., Minneapolis, MN, for Respondent Cooperative Power Association.

Carol K. Lee, Assistant Goodhue County Attorney, Red Wing, MN, for Respondent Goodhue County.

## OPINION

HANSON, Justice.

This appeal arises from the condemnation by respondent Cooperative Power Association (CPA) of property belonging to appellants Danny and Mary Lundell (Lundells). Lundells opposed CPA's condemnation petition, arguing that (1) there was no public purpose or necessity for the taking because CPA already had the use and possession of the property through a lease; (2) CPA acted in bad faith by failing to complete negotiations for amendments to the lease; and (3) CPA was not entitled to use the quick take procedures under Minn. Stat. § 117.042 (2004) because it was already in possession of the property. The Goodhue County District Court granted CPA's petition, finding that CPA had demonstrated a public purpose for the use of the property in its electric utility operations, CPA had demonstrated the need to acquire fee title to the property to eliminate uncertainty as to its use rights and CPA was entitled to use the quick take procedure. The district court made no findings regarding Lundells' bad faith arguments. The court of appeals affirmed, holding that the district court's findings were not clearly erroneous because there was sufficient evidence of public purpose and necessity. The court rejected Lundells' bad faith arguments and affirmed CPA's use of the quick take procedure. *Coop. Power Ass'n v. Lundell,* No. A04–1045, 2005 WL 44911 (Minn.App. Jan.11, 2005). We affirm.

In 1999, CPA entered into a management services agreement with Great River

Energy (GRE) whereby GRE had the power and right to act on behalf of CPA. As a result, this opinion will refer both to actions taken by CPA directly and those taken by GRE on CPA's behalf.

CPA and GRE are cooperative corporations that sell and distribute electricity to their member distribution cooperatives, which in turn distribute electricity to the public. As such, CPA and GRE possess the power of eminent domain under Minn. Stat. § 308A.201, subd. 13 (2004), which allows incorporated cooperatives "engaged in the electrical, heat, light, power, or telephone business [to] exercise the power of eminent domain."

On April 29, 1980, CPA entered into a Land Lease Agreement (the Lease) with Howard and Luella McKinley for the right to use 4.5 acres of the McKinleys' land to house a telecommunications tower (the "Tower"). The Tower is "used to manage electrical power transmission and distribution systems, by, among other things, communicating with electrical substations to monitor and manage electrical flow." The Lease was to expire on February 28, 2015, but was renewable at CPA's option until February 28, 2030. Rent for the property was set at $100 per acre per year, for a total of $450 per year, and was subject to a 10% increase in rent every 5 years beginning in 2005. CPA was responsible for paying any property taxes assessed against the leased land or improvements. From 1980 until the beginning of 2002, CPA paid the specified rent without dispute. CPA did not pay any property taxes.

On December 14, 2001, the McKinleys conveyed title in the property to Lundells. Lundells suspected CPA was subleasing space to another corporation. Further, Lundells could see that CPA was occupying more space and had erected more buildings than permitted by the Lease.

Lundells' counsel inquired of GRE whether CPA's rights under the Lease had been assigned to another company. Because GRE did not respond to the inquiry, Lundells' counsel sent a follow-up letter threatening to evict any undisclosed parties that were occupying the property. GRE's counsel replied that CPA had subleased part of the property to Sprint Spectrum L.P. because it had a legal right to do so. The Lease did not explicitly allow or disallow subleases.

Lundells then requested that CPA pay taxes assessed for the leased property and proposed that the rent for the property be increased from $450 per year to $750 per month ($9,000 per year), which Lundells claimed was the fair-market rental value of the Tower site. GRE refused to pay the proposed additional property taxes, claiming that the information Lundells provided did not clearly establish the amount of taxes assessed to the area that CPA occupied or to the improvements it made. GRE said it was amenable to an increase in rent.

Negotiations for amendments to the Lease continued for approximately 3 months. As a result of the negotiations, GRE drafted a proposed Amendment to the Lease (the Amendment). The Amendment recited an increase in rent to $750 per month. It also explicitly gave CPA permission to sublease and install improvements in its discretion. The Amendment made no mention of taxes.

Although Lundells executed the Amendment and returned it to GRE, neither GRE nor CPA ever executed the Amendment. According to GRE, despite the fact that it drafted the Amendment to recite the increase in rent to $750 per *month,* its intent was to increase the rent to only $750 per *year.*

When Lundells' counsel learned that GRE was unwilling to follow through with the Amendment, he sent GRE notice of default of the Lease and threatened eviction after a 30–day period. The notice of default cited as the grounds for default only CPA's refusal to pay the proposed increased rent.

Thereafter, GRE's board of directors determined by resolution that it was necessary and convenient to acquire ownership of the Tower site and authorized eminent domain proceedings under Minn.Stat. § 308A.201, subd. 13. On April 25, 2003, CPA petitioned the district court to take title and possession of the Tower site by the quick take procedure under Minn.Stat. § 117.042, which allows a condemning authority, when reasonably required, to obtain title to the property before "the filing of an award by the court appointed commissioners."

The district court held a hearing and issued findings of fact and conclusions of law.[1] The district court found that CPA "needs to own the Tower site in fee simple and needs to do so prior to the award of the commissioners to enable [CPA] to maintain and have the Cannon Falls Tower without dispute or uncertainty as to use rights, responsibility for real estate taxes, termination and continuity of use, and the terms and conditions of use and occupancy, and to economically have and maintain the Cannon Falls Tower." The court concluded that CPA "possesses the right of eminent domain and has properly exercised the same herein" and that the "taking of the fee simple absolute title of the land is for a public purpose, and is authorized by law." The court granted CPA's petition to take immediate title to and possession of the land. The court appointed commissioners, who concluded that the total fair market compensation for the taking of the property was $154,005.50, which CPA paid to Lundells.

Lundells appealed and the court of appeals affirmed. The court held that the public purpose of supplying electricity was not in dispute and that the lease dispute between the parties supported a finding of necessity. *Lundell*, 2005 WL 44911, at *2. The court also rejected Lundells' bad faith arguments and affirmed the use of the quick take procedure because of the lease dispute. *Id.* at *3.

We granted Lundells' petition for review.

## I.

Before condemning private land, a condemning authority, such as CPA, must determine that there is a public use for the land and that the taking is reasonably necessary or convenient for the furtherance of that public use. *City of Duluth v. State*, 390 N.W.2d 757, 762–65 (Minn.1986).[2] Although we have said that questions of public use and necessity are

---

1. The court's findings of fact and conclusions of law are identical to the proposed findings and conclusions submitted by CPA. We discourage district courts from adopting proposed findings of fact and conclusions of law verbatim because it does not allow the parties or a reviewing court to determine the extent to which the court's decision was independently made.

2. The "public use," or more frequently called the "public purpose," element comes directly from Minn. Const. art. I, § 13 ("Private property shall not be taken, destroyed or damaged for public use without just compensation therefore, first paid or secured."). The "public necessity" element is inferred from this constitutional provision and from Minn. Stat. § 117.075 (2004) (providing that the commissioners shall value the property only after a determination that "the proposed taking shall appear to be necessary and such as is authorized by law"). *City of Duluth*, 390 N.W.2d at 762–65.

"judicial questions," *id.* at 763–64, the scope of judicial review of the condemning authority's determination of these questions is actually narrower than that characterization might imply. This is because the determinations of the condemning authority are regarded as legislative decisions which will be overturned only when they are "manifestly arbitrary or unreasonable." *Housing & Redevelopment Auth. v. Minneapolis Metro. Co.,* 259 Minn. 1, 15, 104 N.W.2d 864, 874 (1960). Thus, there are two levels of deference paid to condemnation decisions: the district court gives deference to the legislative determination of public purpose and necessity of the condemning authority and the appellate courts give deference to the findings of the district court, using the clearly erroneous standard. *City of Duluth,* 390 N.W.2d at 762.

## A.

 We first examine whether the district court clearly erred in upholding CPA's determination of a public purpose for the taking. Public purpose is construed broadly. *City of Duluth,* 390 N.W.2d at 763. "[T]he standard for overturning a [condemning authority's] decision on public purpose grounds is very strict." *City of Minneapolis v. Wurtele,* 291 N.W.2d 386, 390 (Minn.1980).

The stated purpose of CPA's condemnation is for "locating, having, and keeping a telecommunications tower on the described property" to facilitate the "transmission and distribution of electrical power." We have held that supplying electric power is a public purpose. *See City of Shakopee v. Minn. Valley Elec. Coop.,* 303 N.W.2d 58, 60 (Minn.1981); *see also Town of Fayal v. City of Eveleth,* 587 N.W.2d 524, 528 (Minn.App.1999). Lundells concede that "the use of the land by GRE for its stated purpose—to operate and maintain a tele-

communications tower—has never been in question." Moreover, Lundells do not argue that the land has been or is proposed to be used for any significant nonpublic purpose. Because it is undisputed that the purpose for taking the land is to operate the Tower in conjunction with the transmission and distribution of electricity, we agree with the court of appeals that the district court's refusal to overturn CPA's determination of the public purpose for the taking was not clearly erroneous.

## B.

 We next examine the public necessity for the taking. CPA need not determine that there is absolute necessity, only that the taking is *"reasonably necessary or convenient* for the furtherance of the end in view." *N. States Power Co. v. Oslund,* 236 Minn. 135, 137, 51 N.W.2d 808, 809 (1952) (footnote omitted). To overcome a condemning authority's finding of necessity there must be overwhelming evidence that the taking is not necessary. *City of Duluth,* 390 N.W.2d at 764. "The mere suggestions of possible alternatives to the condemning authority's plan will not in itself support a finding of arbitrariness." *City of Pipestone v. Halbersma,* 294 N.W.2d 271, 274 (Minn.1980).

Lundells do not directly dispute that CPA needs to continue using the Tower to maintain a constant supply of electricity. Rather, Lundells maintain that because CPA had the use and possession of the Tower site under the Lease, CPA must also show that it is necessary to take fee title to the land rather than to continue under the Lease.

 Lundells concede that the existence of the Lease does not prevent CPA from exercising its eminent domain rights because, as we have held, a condemning authority cannot bargain away its power of eminent domain. *Village of St. Louis*

*Park v. Minneapolis, Northfield & S. Ry. Co.,* 156 Minn. 164, 169, 194 N.W. 327, 329 (1923). But Lundells argue that once a condemning authority has the use and possession of property under a lease, its condemnation requires an additional determination of necessity, focused not on the underlying need for the land to further a public purpose but on the need to increase the condemning authority's property interest from a lease interest to a fee interest. We hold that such an additional determination of necessity is not required. Whether or not a condemning authority has a present interest in the land less than fee title, the determination of necessity to support the taking of fee title by eminent domain is the same. The authority need only determine the underlying necessity to use the property in order to further its public purpose. In other words, CPA's determination in support of condemnation is the same whether it has a present lease interest or no interest at all.[3]

From the start, a condemning authority has the option to either condemn property or negotiate some lesser interest in it. It need not choose one alternative over the other. In light of the deference given to condemning authorities, the mere fact that CPA might have had the alternative to continue under the Lease would not invalidate CPA's finding of necessity. Accordingly, we agree with the court of appeals that the district court's refusal to overturn CPA's determination of necessity was not clearly erroneous.

### C.

■ Lundells argue that CPA acted in bad faith and the condemnation "was merely a subterfuge to allow [CPA] to escape its legal obligation under the lease." In essence, Lundells claim that CPA negotiated the lease in bad faith and acted in bad faith in terminating the negotiations. As such, they claim the taking is an abuse of CPA's condemnation power. Incorporated in this argument is Lundells' suggestion that condemning authorities should be required to show good cause for a taking when the authority already has a lease interest in the land.

We have applied a bad faith analysis to condemnation proceedings only in limited circumstances, namely to the public purpose element of the condemnation where the land is being taken from a private party to be transferred to another private party. *See Wurtele,* 291 N.W.2d at 390; *Housing & Redevelopment Auth. v. Schapiro,* 297 Minn. 103, 108, 210 N.W.2d 211, 214 (1973). Those cases do not suggest that good cause must be independently shown in any condemnation proceeding.

In any event, there is no evidence to show that CPA acted in bad faith. Lundells have not claimed that the land is being taken for a private purpose. Moreover, CPA could reasonably have concluded that it did not have any enforceable rights under the Lease. CPA was apparently in breach of the Lease. It was occupying land beyond that described by the Lease, had erected more buildings than permitted by the Lease, and had not paid any property taxes. Lundells had declared the Lease in breach and had threatened eviction. Further, Lundells made it clear that they were unwilling to abide by the original terms of the Lease. Although

---

**3.** Although some public policy arguments might be made to support a requirement that a condemning authority take only the smallest interest in property that is necessary to serve the public purpose, the legislature has not enacted that requirement. Thus, a condemning authority is free to take fee title even though it could serve the public purpose with a leasehold interest, so long as it can demonstrate that its use of the property is necessary to support the public purpose.

the parties had engaged in preliminary negotiations for the Amendment, those negotiations did not ripen into an agreement because CPA refused to sign. Of course, CPA could have secured leasehold rights in the property by signing the Amendment, but this would have required it to capitulate to Lundells' demands, which it had no obligation to do. The mere fact that CPA chose to exercise its power of eminent domain rather than continue negotiations with the landowner does not make this taking an abuse of CPA's condemnation power.

■ Lundells argue that it was bad faith to terminate negotiations and proceed with eminent domain because CPA had a superior bargaining position due to its condemnation power. It is true that a condemning authority has leverage in lease negotiations, but that is leverage that the law intends such an authority to have when it is given the power of eminent domain. A condemning authority has the option to attempt to acquire an interest in the land by negotiation, but it is not obligated to follow that option where, in its discretion, it determines that condemnation of fee title is preferable.

## II.

■ Lundells claim there is no basis for a quick take because CPA was already in possession of the property at the time of the condemnation proceedings. CPA claims it reasonably determined it needed early title to maintain the Tower without dispute or uncertainty so it could continue supplying electricity to the public.

A quick take has been found proper where, even though parts of the condemned property would not be developed until a much later date, "the city needed to assure itself * * * of clear title before further investments were made." *Wurtele*, 291 N.W.2d at 396. Here, CPA's

right to maintain possession of the land under the original Lease had been called into question. Like the condemning authority in *Wurtele*, it was reasonable for CPA to determine that it needed to take immediate title to ensure the continued supply of electricity. Therefore, we agree with the court of appeals that the district court's refusal to overturn CPA's determination that a quick take was reasonably required was not clearly erroneous.

Affirmed.

BLATZ, C.J., took no part in the consideration or decision of this matter.

ANDERSON, PAUL H., Justice (concurring).

I concur in the opinion of the court. I write separately to temper, for my own part, the court's very narrow characterization of our ability to exercise judicial review over what constitutes a public purpose sufficient to warrant the taking of private property under the eminent domain provisions of both the United States and Minnesota Constitutions. While the case before us today does not provide the proper occasion for an in-depth analysis of what type of takings case might require a more demanding standard of review, this court should not foreclose the possibility that a more stringent standard than what we articulate today might be appropriate under certain circumstances. Neither constitution permits a taking that confers benefits on particular, favored private entities with only incidental or pretextual public benefits; yet, the possibility definitely exists that such a case will come before us. If and when such a case comes before us, we must retain the ability to apply a sufficiently demanding level of scrutiny such that the constitutional right of the people of our state to remain secure in the ownership of private property may be protected.

PAGE, Justice (concurring).

I join in the concurrence of Justice Paul H. Anderson.