C.O., Appellant,

v.

John DOE, et al., Respondents.

No. A07–826.

Supreme Court of Minnesota.

Oct. 2, 2008.

Rehearing Denied Nov. 26, 2008.

**345**

Mark A. Olson, Olson Law Office, Burnsville, MN, for appellant.

Michelle L. MacDonald, MacDonald Law Firm, LLC, West St. Paul, MN, for respondents.

## OPINION

PAGE, Justice.

C.O., the biological father of minor A.D., moved to enforce his rights under a contact agreement he entered into with John and Jackie Doe, A.D.'s adoptive parents, pursuant to Minn.Stat. § 259.58 (2006). In response, the Does moved to have C.O.'s motion dismissed and the contact agreement terminated. After hearing arguments on the motions but without holding an evidentiary hearing, the district court granted the Does' motion, concluding that C.O.'s conduct constituted "exceptional circumstances" under section 259.58 warranting termination of the agreement. The court of appeals affirmed. We reverse and remand.

A.D., the biological child of C.O. and T.M., was born in November 2003. A.D. has resided with the Does since two days after her birth. New Life Family Services, a licensed adoption agency, petitioned the Hennepin County District Court seeking the termination of C.O. and T.M.'s parental rights. A hearing on New Life's petition was held on March 7, 2005. That same day, as part of the Does' adoption proceeding, C.O. and T.M. entered into a contact agreement with the Does pursuant to Minn.Stat. § 259.58.

Under the agreement, C.O. had the right to overnight visitation with A.D. ev-

ery third weekend, to take A.D. to church, to be called "Papa C.," to "reasonable telephone contact" with A.D., and to take A.D. (with the Does) to Panama in the fall of 2005 and again when A.D. is older. Under paragraph 11 of the agreement, C.O.'s contact with A.D. was "contingent" upon his abstaining from alcohol or drugs 24 hours before and during visits with A.D. Paragraph 11 also required that C.O. continue to attend substance abuse support group meetings as recommended by his sponsor, submit to breath analysis randomly and at the request of the Does, and let the Does inspect and approve any new home to which C.O. may move. The agreement specifically provided that if C.O. failed to comply with the terms of paragraph 11, the agreement was subject to termination. The agreement further required that C.O. attend adoption classes or adoption counseling and that disputes under the agreement were to be submitted to mediation before being submitted to the courts. On March 7, 2005, all of the parties to the adoption proceeding, which included both birth parents and their respective counsel, A.D.'s adoptive parents and their counsel, and the guardian ad litem and her counsel, as well as a representative of the adoption agency, signed the agreement. The district court also signed the agreement on that date and filed the agreement as its order for ongoing contact between the parties.

By order dated April 12, 2005, the district court, noting that both C.O. and T.M. consented to the termination of their parental rights and that all parties to the adoption proceedings and their representatives had executed an "Adoption Contact Agreement and Order," terminated C.O.'s and T.M.'s parental rights to A.D. The Does subsequently adopted A.D. on August 23, 2005, in Washington County.

Disputes over C.O.'s contact with A.D. under the agreement arose soon after it was executed. In September 2005, after the adoption was final, C.O. and the Does signed an "Addendum to Contact Agreement," postponing the Panama trip until 2006, setting weekly phone calls between C.O. and A.D., and changing overnight visitation to only 12 hours every 3 weeks on a Saturday. The addendum was not made part of the court's order. The Does apparently do not dispute that C.O.'s last visit with A.D. was on June 23, 2006. On July 27 and 31, 2006, and August 2, 2006, C.O. left voicemail messages for the Does' attorney. According to transcripts of the messages made by a paralegal working for the attorney, C.O. stated that A.D. was his daughter, not the Does', that the attorney was "looking for more problems," that the attorney should "prepare for something," and that the attorney was "in trouble."

C.O. sought mediation through Hennepin County Family Court Services to resolve the issues that had arisen under the contact agreement. The Does rejected mediation through Family Court Services and indicated that they intended to pay for private mediation. It is unclear, however, whether private mediation was attempted. In any event, on August 17, 2006, C.O. brought a pro se motion in Hennepin County District Court to enforce his rights under the contact agreement. On September 15, 2006, the Does moved to dismiss C.O.'s motion; to transfer venue to Washington County, their county of residence and of the adoption; to find C.O. in contempt of the contact agreement; and to terminate C.O.'s contact with A.D. based on "exceptional circumstances." As part of their motion, the Does submitted an affidavit detailing the events allegedly occurring between the Does and C.O., including hearsay statements made by C.O.'s former wife. Copies of C.O.'s criminal rec-

ords were attached to the affidavit.[1] The Does also submitted an affidavit from the adoption agency director indicating that the "agency witnessed extreme hostility and volatility from [C.O.] towards agency representatives, prior to and following the termination of his parental rights," and that "it is our strong belief that [C.O.] rejects and disregards the adoption order itself." C.O. submitted an affidavit indicating that he had attended Alcohol Anonymous classes, completed a 12–hour parenting class, contacted his sponsor weekly, and that he worked and attended church.[2]

Venue was transferred from Hennepin County to Washington County, and on January 12, 2007, the Washington County District Court held a hearing on the parties' motions.[3] C.O. appeared with an interpreter but without counsel. The Does were represented by counsel at the hearing. A representative for the adoption agency also was in attendance.

After assurances from the Does' counsel that the district court did not need to appoint a guardian ad litem for A.D. or hold an evidentiary hearing, and after argument by the Does' counsel and statements from C.O., the court indicated that it was vacating the contact agreement and asked counsel for the Does to draft a proposed order. In its written order, apparently taken verbatim from the Does' proposed order,[4] the court found, among other things, that: (1) C.O. "[had] made threats to disrupt the adoption, and used destructive language regarding the child's adoption"; (2) C.O. did not comply with the contact agreement because he failed to abstain from alcohol consumption, attend substance abuse meetings, submit "to reasonably requested random breath analysis," and refused to allow the Does to inspect his home; (3) C.O. failed to attend an adoption class or counseling as required by the contact agreement; (4) C.O.'s threats to take A.D. from her adoptive home "show[ ] an overall disregard and contempt for the duly entered decree of adoption"; (5) C.O. "made no showing with respect to his compliance with the terms" of the contact agreement; (6) C.O. "has repeatedly used destructive and disrespectful language" regarding A.D. and her adoption; (7) the Does fear C.O.; (8) C.O. referred to A.D. as his "daughter" at the hearing and told the court the Does "purchased" A.D. for $13,000; (9) exceptional circumstances have arisen; (10) continued contact between C.O. and A.D. would interfere with the Does' parental relationship with A.D.; and (11) it is in A.D.'s best interests to have no further contact with C.O. As a result of these findings, the

1. According to those records, it appears that C.O. was convicted of a number of offenses, all of which occurred before the parties entered into the contact agreement in 2005.

2. C.O. also attached documents, including: a letter from his sponsor attesting to C.O.'s sobriety; the certificate for his 12–hour parenting class, dated January 5, 2005; a progress report for an abuse counseling program, dated February 1, 2005; and a letter detailing C.O.'s attendance from May 2003 to December 2004 at substance abuse counseling groups.

3. C.O. does not contest the change of venue to Washington County, and therefore the issue of whether motions to enforce and modify an order approving contact agreements are properly venued in the county in which the agreement is approved or, as in this case, in the county in which the adoption was finalized, is not before us.

4. We again take the opportunity to discourage district courts from adopting parties' proposed findings verbatim. See Lundell v. Coop. Power Ass'n, 707 N.W.2d 376, 380 n. 1 (Minn. 2006). As we have noted, the practice "does not allow the parties or a reviewing court to determine the extent to which the court's decision was independently made." Id.

court ordered C.O. to have no further contact with A.D. or the Does. C.O. appealed.[5]

In an unpublished decision, a divided court of appeals affirmed the district court order terminating C.O.'s contact with A.D. *C.O. v. Doe, et al.,* No. A07–0826, 2007 WL 4111206, at *1 (Minn.App. Nov.20, 2007). The court concluded that "[t]he record supports the district court's findings that [C.O.] violated multiple provisions of the contact agreement," including the requirements that he attend an adoption class and substance abuse counseling. *Id.* at *4. Although the court acknowledged that the district court's findings that C.O. failed to abstain from alcohol before visiting A.D., failed to submit to breath tests, and failed to allow the Does to inspect his home were not supported by the record, the court concluded that the unsupported findings "represent a small portion" of the district court's findings.[6] *Id.* The court of appeals appears to have also concluded that the district court's admission of certain hearsay evidence[7] did not prejudice C.O. because the district court did not reference the hearsay in its findings of fact. *Id.* As for C.O.'s argument that he was entitled to an evidentiary hearing, the court noted that C.O. was given an opportunity to "make [his] argument" at the

hearing and that he was provided an interpreter. *Id.* at *5. Therefore, according to the court, "[C.O.] was given a sufficient opportunity to be heard" and "his due-process rights were satisfied." *Id.* Finally, the court concluded that the district court's determination that C.O.'s threats constituted "exceptional circumstances" was not clearly erroneous and that the district court did not abuse its discretion in vacating the contact agreement in A.D.'s best interests. *Id.*

■  Here, C.O. argues that: (1) the termination provision in the contact agreement is not enforceable, as Minn.Stat. § 259.58 allows only modification of contact agreements and not termination; (2) if the provision is enforceable, the party whose rights are subject to termination should have the same procedural rights as individuals whose parental rights are being terminated; (3) no "exceptional circumstances" exist in this case; and (4) the district court violated his right to due process when it denied him an evidentiary hearing.[8] Because the district court erred in not holding an evidentiary hearing in the face of disputed facts material to the parties' motions, we reverse the district court, reinstate the contact agreement, and

5.  In the court of appeals, C.O. filed his notice of appeal and his appellate brief pro se; however, he was represented by counsel at the time he filed his reply brief and at oral argument.

6.  Although the court of appeals concluded that the unsupported findings were insignificant in light of the record, it is not so clear to us that the findings were unimportant. Nor is it clear, from the limited record before us, that the findings identified by the court of appeals as unsupported are the only such unsupported findings.

7.  In an affidavit filed with the court, the Does included allegations made by C.O.'s former girlfriend about C.O.'s plans to abduct A.D., the way C.O. "work[s] the system," his threat-

ened use of violence, and his inappropriate contact with underage girls.

8.  Because C.O. appeals only the district court order granting the Does' motion to modify the agreement and not from the apparent denial of his motion to enforce the agreement, we limit our consideration to the court order granting the Does' motion.

Further, the Does' argument that Minn. Stat. § 259.58 is unconstitutional is not an issue before the court. We granted C.O.'s motion to strike the Does' brief to the extent the Does argued in the brief that the statute is unconstitutional, as the issue was not raised below.

remand to the district court for further proceedings.

## I.

Minnesota Statutes § 259.58 allows adoptive parents to enter into agreements with birth relatives and foster parents regarding communication and/or contact with the adopted minor. Under section 259.58(a), such an agreement "is not legally enforceable unless the terms of the agreement are contained in a written court order entered in accordance with this section." Section 259.58(b) provides that failure to comply with the terms of an agreed contact or communication order is not grounds for setting aside the adoption itself or revoking the birth parents' consent to the adoption. At the same time, section 259.58(c) provides for enforcement of agreed contact orders by the district court and specifically provides that an agreed contact order may not be modified unless the district court "finds that the modification is necessary to serve the best interests of the minor adoptee" and either the parties agreed to the modification or "exceptional circumstances have arisen since the agreed order was entered that justify modification of the order."

The district court, relying on the written submissions of the parties and statements made at the motion hearing, vacated the order approving the contact agreement after concluding that exceptional circumstances had arisen and that doing so was in A.D.'s best interests. On appeal, C.O. argued that he was denied due process in the district court and, particularly, an evidentiary hearing. The court of appeals concluded that C.O. "was given a sufficient opportunity to be heard," but did not specifically address the argument that an evidentiary hearing was needed. *C.O.*, 2007 WL 4111206, at *5.

Whether due process is required in a particular case is a question of law, which we review de novo. *Carrillo v. Fabian*, 701 N.W.2d 763, 768 (Minn.2005) (citing *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Alcozer v. N. Country Food Bank*, 635 N.W.2d 695, 701 (Minn.2001)). To determine whether a party has a due process claim, we conduct two inquiries, first determining whether the party has a protectable liberty or property interest with which the state interfered and, if so, then determining whether the procedures used were constitutionally sufficient. *Id.*

We look to the nature of the interest to determine if it is within the scope of protection of the Fourteenth Amendment. *Id.* "It is recognized that contractual rights are a form of property within the meaning of the due process clause." *AFSCME, Councils 6, 14, 65, AFL–CIO v. Sundquist*, 338 N.W.2d 560, 574 (Minn.1983). If state law "secure[s] certain benefits" to a party to a contract or "support[s] claims of entitlement to those benefits" created by the contract, then a party has a property interest in his or her contract that is protected by the Due Process Clause. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (assessing whether professor had a protected property interest in continued employment at state college by looking at the terms of employment contract); *see also Slochower v. Bd. of Educ.*, 350 U.S. 551, 556–57, 76 S.Ct. 637, 100 L.Ed. 692 (1956) (holding that college professor had protected property interest in employment at college because state law allowed petitioner to be discharged only for cause).

In this case, Minn.Stat. § 259.58 allows birth parents and adoptive parents to enter into a legally enforceable agreement for contact with the adoptee. *See*

Minn.Stat. § 259.58 (stating that adoptive parents and birth relatives "may enter an agreement regarding communication with or contact between an adopted minor, adoptive parents, and birth relative[s]" and that such an agreement "is not legally enforceable unless the terms of the agreement are contained in a written court order entered in accordance with this section"). Moreover, under section 259.58, the order approving the parties' agreement cannot be modified, absent both parties' consent, unless the court finds that modification is necessary to serve the best interests of the child and "exceptional circumstances have arisen since the agreed order was entered that justify modification of the order." C.O. therefore has a property interest in the contact agreement that is protected by the Fourteenth Amendment.

■ In evaluating whether an evidentiary hearing is required before modifying (or, in this case, terminating) a contact agreement, we apply a three-part balancing test, considering: (1) the private interest affected; (2) the risk that the procedures used will result in erroneous deprivation of that private interest and the probable value of additional or substitute procedural safeguards; and (3) the State's interest in the procedures provided, including the administrative burden and expense that additional procedures would require. *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (cited in *Matter of Welfare of J.W.*, 391 N.W.2d 791, 794 (Minn.1986)).

■ We conclude that the process followed by the district court here is constitutionally insufficient under the *Mathews* test. With respect to the first prong of the *Mathews* test, as indicated, C.O. has a protected property interest under the contact agreement in continuing contact and communication with A.D., which was eliminated by the district court's order.

■ As to the second prong of the *Mathews* test, the risk that the district court's summary adjudication could result in an erroneous decision is significant. The degree of potential deprivation that may be created by a particular decision is a factor to be considered at this stage of the analysis. *Id.* at 341, 96 S.Ct. 893. The district court's order vacating its earlier order approving the contact agreement and ordering no further contact between C.O. and A.D. permanently and completely deprived C.O. of his rights under the contact agreement and left him with no recourse, save to appeal. Thus, the Does' motion to terminate the contact agreement was more than an interim procedural step: it fully and finally determined the outcome of the matter. In that respect, the Does' motion to terminate the contact agreement was effectively a motion for summary judgment. We have repeatedly stated that where evidence is in conflict, summary judgment is inappropriate. *E.g., Vieths v. Thorp Finance Co.*, 305 Minn. 522, 525, 232 N.W.2d 776, 778 (1975) (summary judgment is not a substitute for trial where there are fact issues to be determined).

Further, the Does' argument for termination of the contact agreement relied almost exclusively on out-of-court statements made by C.O.'s former girlfriend to the Does, transcripts of taped messages left by C.O. for the Does and their attorney, and an affidavit by the head of the adoption agency that placed A.D. with the Does attesting to a phone call to the agency from C.O. Based at least in part on the Does' evidence, the district court concluded that exceptional circumstances existed. However, reliance on the out-of-court statements made by C.O.'s former girlfriend to the Does raises questions of mo-

tive and reliability that, as the United States Supreme Court has observed, can be answered only through confrontation and cross-examination:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination.

*Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Yet, the district court did not require the Does to produce C.O.'s former girlfriend or any employee of the adoption agency for cross-examination, instead it accepted their version of events as fact in the face of C.O.'s denials.

As for the messages, the Does variously characterized them as "furious," "threatening," and "bullying," adjectives that would appear to convey a particular tone of voice. Even Jackie Doe argued that the district court "need[ed] to hear [the messages] to really understand our fear" of C.O. Further complicating the situation is the fact that C.O.'s first language is not English, raising questions of whether C.O.'s statements accurately conveyed his meaning, whether his statements were misunderstood by the transcriber, and whether the listener's understanding of the statements was colored by the language barrier. Yet the audiotapes themselves were apparently never submitted to or considered by the court.

■ Finally, we again note that summary judgment is not a means of deciding cases in which the facts are disputed. *See Vieths,* 305 Minn. at 525, 232 N.W.2d at 778. In this case, the underlying facts were disputed. The Does claimed that C.O. had not complied with the conditions precedent to his contact with A.D., but C.O. claimed he had complied and submitted evidence in support of his compliance. The head of the adoption agency responsible for A.D.'s placement with the Does claimed that C.O. had been verbally abusive to the agency's staff, but C.O. denied he had sworn at the staff member, threatened litigation, or complained about the adoption. In fact, C.O. claimed that the person who answered his call "couldn't understand me and told me I had the wrong number."

■ Regarding the third prong of the *Mathews* test, namely, the State's interest in the procedures employed by the district court, the legislature has indicated its interest in preserving a contact agreement once entered into and approved by the court. Minn.Stat. § 259.58(c). In the absence of an agreement by the parties to modify the contact agreement and a court order approving the modified agreement, the statute limits the circumstances warranting modification in two ways: the modification must be in the child's best interests, and there must exist "exceptional circumstances" that have arisen "since the agreed order was entered" or the parties must agree to the modification. *Id.* An evidentiary hearing, limited to those circumstances that could warrant modification, would entail a relatively limited fiscal and administrative burden on the State's interest that, in comparison, does not out-

weigh C.O.'s interest in preserving his rights under the contact agreement.

Under the facts presented in this case, we conclude that the district court should have conducted an evidentiary hearing with respect to the Does' motion to modify or terminate the contact agreement. We reverse the court's order granting the Does' motion to terminate the contact agreement, reinstate the contact agreement,[9] and remand for an evidentiary hearing on the Does' motions.[10]

## II.

■■■ For guidance on remand, we also address C.O.'s claims of error regarding the appropriate standard and burden of proof under Minn.Stat. § 259.58 and whether the district court's findings of fact are supported by the record. Identification of the applicable burden and standard of proof presents questions of law, which we review de novo. *See Estate of Kinney*, 733 N.W.2d 118, 127 (Minn.2007) (concluding that the party challenging an antenuptial agreement bears the burden of proof); *Wallace v. Carpenter Elec. Heating Mfg. Co.*, 70 Minn. 321, 332, 73 N.W. 189, 192 (1897) (concluding that trial court's erroneous determination of party's burden of

proof required reversal); *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008) (stating legal questions are reviewed de novo).

■■■ The applicable statute, Minn. Stat. § 259.58, does not specify which party bears the burden of proof as to either motions to enforce or to modify contact agreements.[11] The general rule is that the burden of proof rests on the party seeking to benefit from a statutory provision. *Application of White Bear Lake*, 311 Minn. 146, 150, 247 N.W.2d 901, 904 (1976). We review a district court's determination of which party bears the burden of proof de novo. *See Kinney*, 733 N.W.2d at 127; *Wallace*, 70 Minn. at 332, 73 N.W. at 192, *Carlson*, 749 N.W.2d at 45.

■■■ In addressing the Does' motion seeking "[a] finding that exceptional circumstances [had] arisen since the contact order was entered [justifying] termination of [C.O.s] contact" with A.D., the district court, without identifying either the burden or standard of proof, determined that exceptional circumstances existed warranting termination of the contact agreement and that termination of the agreement would be in A.D.'s best interests. In making this determination, it appears that the

---

9. During the pendency of the proceedings on remand, the district court may impose reasonable conditions on C.O.'s contact with A.D., such as requiring that visitation be supervised by a third party. The district court may also consider the appointment under Minn.Stat. § 259.65 of a guardian ad litem for A.D. to assist the court in determining whether termination or modification of the contact agreement is in A.D.'s best interests.

10. Because we conclude that the district court should have conducted an evidentiary hearing, we do not reach the question of whether termination (and not just modification) of contact agreements is permitted under the statute. We note that the issue of whether Minn.Stat. § 259.58 allows the court to terminate, rather than merely modify, an

agreement is not before us. When the parties to a contact agreement agree to a termination provision and that term is approved by the district court as part of the agreement under the statute, we will not look behind the agreement. Nor do we need to determine whether "exceptional circumstances" is a term subject to judicial construction.

11. Nor does section 259.58 bar the parties from agreeing among themselves as to who bears the burden of proof in future proceedings to enforce or modify the agreement. Because this contact agreement reflects no such agreed-upon allocation of the burden of proof and because the parties here have not raised the question in these proceedings, we leave to another day the question of whether such an agreement is enforceable.

court relied on its factual findings that C.O. failed to show he complied with the agreement's terms. Applying the general principle, we conclude that the burden of showing the existence of exceptional circumstances justifying modification of the contact agreement rested with the Does. To the extent that the court relied on its findings about C.O.'s failure to prove compliance with the terms of the agreement, the court improperly put the burden of proof on C.O. and not on the Does.

■ Having identified the applicable burden of proof, we turn our attention to the applicable standard of proof. It is not clear from the record what standard of proof the district court applied to the Does' motion. There are three basic standards of proof: preponderance of the evidence, clear and convincing, and beyond a reasonable doubt. *Carrillo v. Fabian,* 701 N.W.2d 763, 774 (Minn.2005) (citing *Addington v. Texas,* 441 U.S. 418, 423–24, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). We have stated that "[t]he purpose of a standard of proof for a particular type of adjudication is to instruct the fact finder on the degree of confidence our society desires the fact finder to have in the correctness of his or her conclusions." *Id.* at 773–74. Accordingly, the beyond-a-reasonable-doubt standard is used in criminal cases "because the defendant's interests are so strong that the likelihood of erroneous judgment must be minimized as much as possible." *Id.* at 774. Civil cases typically employ the preponderance standard "because society has a 'minimal concern' with the outcome of private suits." *Id.* (quoting *Addington,* 441 U.S. at 423, 99 S.Ct. 1804).

In addition, a preponderance-of-the-evidence standard signals that the parties should "share the risk of error in roughly equal fashion." *Addington,* 441 U.S. at 423, 99 S.Ct. 1804. Civil cases with "quasi-criminal wrongdoing" may use the clear-and-convincing standard "because the defendant's interests at stake in those cases are more substantial than those present in a typical civil case." *Carrillo,* 701 N.W.2d at 774.

■ The legislature can prescribe standards of proof for statutorily-created causes of action, as this is. *See Seeley v. Sobczak,* 281 N.W.2d 368, 370 (Minn.1979). When the legislature has not prescribed a standard for statutorily-created causes of action, "this is regarded as a signal that the legislature intended the preponderance of the evidence standard" to apply. *State v. Alpine Air Prods., Inc.,* 500 N.W.2d 788, 790 (Minn.1993) (applying preponderance standard to civil fraud case).

■ Because neither Minn.Stat. 259.58 nor the contact agreement itself identifies a standard to be applied, the appropriate standard to be applied here is preponderance of the evidence.[12] In cases involving contact agreements, the consequences of an error in either direction (wrongfully modifying or wrongfully failing to modify) are of equal concern, and the parties should therefore "share the risk of error in roughly equal fashion." *Addington,* 441 U.S. at 423, 99 S.Ct. 1804. Further, requiring that the preponderance-of-the-evidence standard be applied to actions under section 259.58 will make such actions consistent with the standard used in both

**12.** As with the burden of proof, section 259.58 does not bar the parties themselves from agreeing on a different standard of proof to be applied to future proceedings under the contact agreement. Because this contact agreement reflects no such agreement and because the parties have not raised the question in these proceedings, we leave to another day the question of whether such an agreement is enforceable.

contested and uncontested adoption proceedings. *See, e.g.,* Minn. R. Adoption. P. 42.04 (requiring the petitioner to "prove by a preponderance of evidence the facts alleged in the adoption petition and that the adoption is in the best interests of the child"); 44.04 (same). We therefore conclude that, on remand, the standard of proof to be applied to the Does' motion to modify the contact agreement is the preponderance of the evidence.

Reversed and remanded.

DIETZEN, J., took no part in the consideration or decision of this case.